COHEN et al. v. CITY OF HOUSTON et al.
(No. 6934.)

(Court of Civil Appeals of Texas. Galveston.
April 3, 1915. Rehearing Denied
April 29, 1915.)

1. MUNICIPAL CORPORATIONS ☞29—ANNEXATION OF TERRITORY—CHARTER PROVISIONS—VALIDITY.

Acts 33d Leg. c. 147 (Vernon's Sayles' Ann. Civ. St. 1914, arts. 1096a–1096i), adopted to put into effect the amendment to Const. art. 11, § 5, which authorized cities to adopt or amend their charters, but provided that no such charter should contain any provision inconsistent with the constitution of the state, or the general laws, which act gave to a city adopting its own charter under that amendment power to fix boundary limits, provide for the extension of boundary limits, and the annexation of additional territory, superseded in so far as such cities were concerned, Rev. St. 1911, art. 781, which requires a vote of the inhabitants of outlying territory before it can be annexed to a city, so that a provision of a city charter authorizing it to extend its boundaries so as to include adjacent territory without vote of the inhabitants of such territory, does not conflict with a general law.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 66–75; Dec. Dig. ☞29.]

2. MUNICIPAL CORPORATIONS ☞29—ANNEXATION OF TERRITORY—SUBMISSION TO VOTE—NECESSITY.

The Legislature can authorize a city to annex additional territory without the consent and even against the remonstrance of the residents of such territory.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 66–75; Dec. Dig. ☞29.]

3. MUNICIPAL CORPORATIONS ☞29—ANNEXATION OF TERRITORY—OBJECTIONS—INDEBTEDNESS OF CITY.

It is no constitutional objection to the annexation of territory to a city, without the consent of the residents of such territory, that the territory is thereby subjected to taxation to discharge a pre-existing debt of the city.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 66–75; Dec. Dig. ☞29.]

4. MUNICIPAL CORPORATIONS ☞33—DE FACTO CORPORATION—ATTACK.

Where a city had extended its boundaries under its charter so as to include new territory, and had exercised governmental control over the new territory, it was a de facto municipal corporation throughout the entire territory, and the legality of the charter provisions for annexation cannot be attacked in a suit by residents in the annexed territory to restrain the city from issuing bonds.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 81–97; Dec. Dig. ☞33.]

5. INJUNCTION ☞24—BONDS—INJUNCTION AGAINST ISSUANCE—"BALANCE OF CONVENIENCE."

Where the right of complainants to enjoin the issuance of city bonds, because the territory in which their property was located was illegally annexed to the city, is doubtful, the injunction will be denied on the doctrine of "balance of convenience," which is the rule that where in a doubtful case, the granting of an injunction would cause greater harm to the defendant if he should prevail than its refusal would cause to the complainant if he should prevail, the injunction will be denied, and where in such doubtful case the refusal of an injunction will cause greater damage to the complainant if he were ultimately successful than the injunction would to the defendant if he should thereafter succeed, it will be granted, since in such case the complainants, if their property is not subject to taxation to pay the bonds, can resist the collection of the taxes therefor, while to grant the injunction would interfere with the construction of public improvements for the city.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 23; Dec. Dig. ☞24.]

6. MUNICIPAL CORPORATIONS ☞993—BONDS—INJUNCTION AGAINST ISSUANCE—MISAPPROPRIATION OF FUNDS.

The fact that a city had misappropriated money in the sinking fund created to pay previous bond issues, does not authorize an injunction against a subsequent bond issue until that money has been restored; especially where the complainants are not holders of the other bonds, since the principle of equity that a defaulting trustee can be restrained from further exercising the trust until he has made the default good, does not apply to municipal corporations exercising sovereign powers, and that right can be enforced against a trustee only by the beneficiaries of the trust.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2158–2161; Dec. Dig. ☞993.]

7. MUNICIPAL CORPORATIONS ☞929—BONDS—SUBMISSION TO VOTERS—INSTALLMENTS.

A city can issue, in installments as they are needed for the work, bonds, though the question submitted to the voters was the issue of total amount, where the intention to issue in installments was stated by the city officials in a public newspaper of wide circulation.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1942; Dec. Dig. ☞929.]

8. MUNICIPAL CORPORATIONS ☞915—BONDS—AMOUNT—LIMIT OF TAXING POWER—ISSUANCE IN INSTALLMENTS.

Such bonds are not invalidated because the total amount authorized was such that the city could not levy a tax sufficient to pay the interest thereon, and provide the required sinking fund, if each installment thereof was not to be issued until the taxable valuations had increased sufficiently so that the interest and sinking fund could be provided for.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1906, 1909–1912; Dec. Dig. ☞915.]

Appeal from District Court, Harris County; John A. Read, Judge.

Action by H. F. Cohen and others against the City of Houston and others. From an order of the district court refusing to grant a temporary injunction, plaintiffs appeal. Affirmed.

Wilson, Dabney & King, of Houston, for appellants. J. C. Hutcheson, Jr., and Winston McMahon, both of Houston, for appellees.

McMEANS, J. This is an appeal from an order of the district court of Harris county refusing to grant a temporary injunction upon the application of the plaintiffs, who are appellants here.

Plaintiffs sought a temporary injunction to restrain the city of Houston from holding an election to determine whether several is-

sues of bonds aggregating in amount $5,-450,000 should be issued and from doing any other acts toward the issuance or sale of such bonds, or the collection of taxes on account of same, upon the following grounds:

(a) That the city of Houston did not have available taxable values in sufficient amount out of which it could make provision at the time of issuing of said bonds to levy a tax sufficient to pay the interest thereon, and to create a sinking fund of at least 2 per cent. per annum as required by law to redeem the same at maturity.

(b) That the city of Houston had outstanding bonds in the aggregate sum of $9,-855,000, and that at the time of issuing same provision had been lawfully made for a levy of a tax sufficient to pay the interest on said bonds each year, and to create a sinking fund of at least 2 per cent., as provided by law, for each year throughout the period of same; that of the amount collected on account of the sinking fund of said outstanding bonds, only a minor portion thereof had been preserved, but that the larger portion of the amount collected as such sinking fund, to wit, $1,500,000, had been misapplied by the city of Houston to other purposes; that the city of Houston acted in the assessment, collection, and preservation of said sinking fund as a trustee, and in the execution of its trust it had no right to issue the $5,450,000 of new bonds unless and until the city had first replaced in the sinking fund the amount which it had misapplied.

(c) That it was not contemplated or intended by the city of Houston to make immediate public improvements of the magnitude as submitted to the people in said bond election, but it was the intention and purpose of the city and its officers to issue said bonds in installments through a period of five years, according as the said improvements might, in the opinion of the city officials, be needed, and the increased available taxable values in the city should warrant.

(d) That the present officials of the city of Houston had removed $200,000 in cash from the sinking fund and used same in the building of public improvements, and had placed in the sinking fund in lieu thereof the bonds of the city in the sum of $200,000, issued for public improvements, and which had never been sold in the market of the city of Houston, and which bonds mature at a date later than the bonds secured by the sinking fund which were removed; and that the city should be enjoined from the issuance of the new bonds until this $200,000 had been replaced in the sinking fund in money.

(e) That on the 15th day of October, 1913, the city of Houston had undertaken to amend its charter, and to thereby extend its limits more than a mile in several directions, and including a resident population of some 5,000 people, without giving the persons in the territory thus made a part of the city by amendment a right to vote thereon; that the inclusion of said territory into the city was illegal and void, and there was no authority in the city to hold the election in said territory for the purpose of authorizing the issuance of bonds, and that the city should be enjoined from issuing said bonds against said territory, or from collecting any city taxes off of property in said territory, or exercising any other right of government therein.

When the petition for injunction was presented to the court, the court indorsed thereon an order for notice to be issued to defendants to appear at the time and place stated in the order, to show cause why the injunction should not be granted as prayed. The defendants on the date set for the hearing filed its answer, presenting its defenses, first presenting a demurrer to so much of the petition as sought to enjoin the holding of the election, which was sustained. Afterwards, and before the hearing was had on the merits, the election was held and the proposition to issue the bonds was carried.

On November 2, 1914, a hearing on the merits was had upon the petition and answer, and affidavits and copies of documents, and thereafter the court entered judgment sustaining all of defendants' contentions as to the right to issue the bonds, and denying plaintiffs any of the relief prayed, except that the defendants were commanded and enjoined:

"(1) That they do not hereafter invest the sinking fund of any bond issue of the city of Houston, in bonds maturing later than the bonds secured by such sinking fund.

"(2) That they proceed at once to prepare and keep proper books with separate and distinct accounts thereon, showing at all times the condition of the sinking fund of each specific bond issue, and showing all amounts paid out of the sinking fund of each specific bond issue, and all amounts added thereto from time to time.

"(3) That defendants and each of them be commanded and enjoined that hereafter the levy of the sinking fund taxes made in the annual levy of each year shall be made in such manner as to show specifically the portion or amount of the levy that is made for each outstanding bond issue for the city of Houston."

From the judgment of the court refusing to enjoin the issuance of the bonds, the plaintiffs have appealed.

On the trial the following facts were established by the evidence and admission of the parties:

(a) The city of Houston is incorporated under and by virtue of a special act of the Legislature of Texas adopted in 1905. The boundaries of the city, as established by the act, are described as "four miles square, to be run with the cardinal points of the compass, of which the center of the courthouse square of Harris county, in the city of Houston shall be the center," except where such boundaries would conflict with the boundaries of the incorporated town of Houston Heights. The city, within the boundaries thus established, contains a population of

near 100,000 persons and taxable values of $103,000,000.

On October 15, 1913, at an election held among the qualified voters resident within the boundaries of the city, as established by the special act, the proposition was adopted to extend the boundaries of the city so as to include additional territory, having a population of some 5,000 persons and taxable values of about $6,000,000. At this election the qualified voters residing within the additional territory did not vote. Thereafter the city, seeking to avail itself of what is popularly known as the "Home Rule Amendment" to the Constitution of Texas, adopted November 6, 1912, and of the enabling act adopted by the Legislature, approved April 7, 1913, amended its charter, and by this amendment the boundaries of the city were so defined as to include said additional territory, and the city since has exercised the functions of government over the territory described in its charter as amended. At the time of the adoption of this amendment the city had a bonded indebtedness of $9,855,000.

The plaintiffs are 16 in number. Some of them reside and own taxable property in the added territory, others live within the original boundaries of the city, and own property situated in the added territory subject to taxation, and still others are nonresidents of Harris county, but own property in the added territory subject to taxation. None of them was shown to be an owner or holder of any of the bonds of the city.

(b) The city of Houston by ordinances duly passed on September 21, 1914, called an election to be held on October 28, 1914, at which none but qualified voters and taxpayers residing within the boundaries of the city, as extended, should be allowed to vote, to pass upon the question of whether or not the city should be authorized to issue bonds for five separate purposes, viz.: (1) in the sum of $3,000,000, to be paid serially in one to forty years after issuance, the proceeds of said bonds, when sold, to be used for the purpose "of making permanent city improvements, to wit, wharves, docks, and slips, and other appliances and structures for facilitating or accommodating commerce or navigation on Buffalo Bayou Ship Channel"; (2) in the sum of $1,000,000, etc., the proceeds of same, when sold to be used for the purpose of making permanent city improvements, viz., drainage and sewerage in the city; (3) in the sum of $1,000,000, etc., the proceeds of same, when sold, to be used in making permanent city improvements, to wit, sanitary sewerage, disposal plants, with the necessary sanitary sewers and connections, and all other structures and appliances incident to a complete sanitary sewerage system in the city; (4) in the sum of $250,000, etc., the proceeds of same, when sold, to be used for the purpose of making permanent city improvements, viz., the perfecting of the public park system of the city, by providing the necessary enlargements and additions thereto, together with all public driveways, walks and other structures and appliances necessary to the public use and enjoyment thereof; and (5) in the sum of $200,000, etc., the proceeds of same, when sold, to be used for the purpose of making permanent city improvements, to wit, to build permanent public school buildings in said city. No question is made as to the regularity of the form of the ordinances calling the election, and there is therefore no necessity for copying them here. The election was held on the date for which it was called, and resulted in a large majority of the qualified voters who participated therein voting in favor of granting to the city the authority to issue the bonds in the several amounts, and to be used for the various purposes specified.

(c) The taxing power of the city of Houston is limited by its charter to a tax of $2 upon each $100 valuation of taxable property within its limits. At the time of the holding of the election above mentioned it had levied a tax of $1.15 on the $100 valuation for general purposes, and 70 cents on the $100 valuation for the purpose of paying the interest upon its outstanding bonded debt, amounting, as before stated, to $9,855,000, and for the purpose of accumulating a sinking fund to discharge such debt at maturity; and it is admitted that this tax of 70 cents on each $100 valuation of such property is sufficient for that purpose. This, then, left only a margin of 15 cents on each $100 valuation available to pay the interest upon, and to create a sinking fund for the redemption of, the proposed issues of bonds, at their maturity, which is admittedly not sufficient for that purpose. It is charged by the plaintiffs and admitted by the defendants that it is not the purpose of the city to issue the entire bond issue of $5,450,000 at one time, but to issue the same in annual installments throughout a period of five years to follow, and to negotiate the same as the legislative discretion of the city council and the necessities of the city shall demand. Prior to the election above mentioned the mayor of Houston and the harbor board of said city, published in the Houston Post, a paper of wide circulation in said city, a statement with reference to the proposed bond issues, from which it appeared that it was the intention and purpose of the city to issue each of said sets of bonds in five annual installments, throughout the five years to follow, it being assumed that there would be a steady increase in property values sufficient to provide for the issuance of each of said installments, inasmuch as there had been a similar increase in value in the five preceding years; and it was stated in said published statement that "we promise that the bonds will only be sold and the funds expended from year to year as further permanent municipal

harbor improvements are made necessary by the business developed." It is evident that the city intended to issue the bonds in installments as money should be needed to prosecute the work contemplated, and as the available taxable values would warrant, and that the purpose of the city was to not issue any installment of any set of the proposed bonds unless at the time of issuance the available taxable values and the margin of taxing power were sufficient, as the basis of the levy of a tax sufficient to pay the interest on the bonds and create a lawful sinking fund for their redemption at maturity. For the first annual installment the city proposed and intended to issue bonds, for the various purposes for which they were voted, in the total amount of $1,950,000, divided as follows: Wharf, etc., $500,000, drainage, etc., $500,000, sanitary sewers, etc., $500,000, school buildings, etc., $200,000, park improvements, etc., $250,000. A tax of 15 cents on each $100 valuation on the taxable property within the city, the total of which is $109,000,000 (or of $103,000,000, if the property values in the added territory be excluded) would produce a sum more than sufficient to pay the interest upon this installment, and accumulate a sinking fund sufficient to redeem the bonds at maturity.

(d) At the time of the election to determine whether the city should be authorized to issue the bonds in question the city, as before stated, had a bonded indebtedness of $9,855,000, none of which has matured. There had been collected by taxation and passed into the sinking fund to redeem these bonds approximately the sum of $1,928,608.33. Of this sum there had been diverted and applied to other uses by the city administration prior to that of Ben Campbell's, the present administration, approximately the sum of $1,299,927.16, so that instead of there being on hand the full sum collected on account of the sinking fund, there remains in said fund in money and securities approximately only the sum of $628,681.17. During the present administration and subsequently to the amendment by the city of its charter, whereby the boundaries of the city were extended, the city of Houston, acting under its charter which authorized it to issue bonds in sums not exceeding $100,000 for any one purpose, without being authorized to do so by a vote of the property taxpayers of the city, issued bonds in the sum of $100,000 for the purpose of constructing an annex to the City Hall, and $100,000 for the construction of sewer extensions, and further acting under its charter, which authorized it to invest the sinking fund in the purchase of its bonds, provided that such bonds do not mature at a date later than the maturing of the bonds whose sinking fund was thus used, purchased both bond issues for the use and benefit of the sinking fund, paying in cash therefor, out of the

moneys in this fund, the par value of said bonds and accrued interest, and with the money thus obtained constructed the City Hall annex and sewer extension. These bonds matured at a date later than the bonds, to pay which the sinking fund had been and is being collected, mature.

The city owns several hundred thousand dollars of free assets, which can be converted into cash and with which the depleted surplus fund can be in part restored.

(e) Prior to June 30, 1911, the cash and securities in the sinking fund were held in lump, and there had not been a separate levy and collection of the sinking fund for each respective issue of bonds, but since said date a separate levy and collection for each issue has been made, and a separate account kept.

The pleadings of the parties are quite voluminous, and for that reason we have not undertaken to set them out in this opinion, but we think it is sufficient to say that the facts adduced were properly admitted under the issues raised by them.

[1] We shall first consider the contention of appellants to the effect that the extension of the city limits so as to include a larger area of outlying territory was illegal and void.

As has been hereinbefore shown, the special act of 1907, granting a charter to the city of Houston, defined the boundaries thereof as four miles square, of which the center of the courthouse square in Harris county, in the city of Houston, should be the center. At the time of the passage of the Special Act no power was lodged in any incorporated city in this state by general law by which it could, in any manner, extend its boundaries, except in the manner prescribed by article 574 of chapter 10, title 18, Revised Statutes 1895 (article 781, Revised Statutes 1911) which, in part, reads as follows:

"Whenever a majority of the inhabitants qualified to vote for members of the state Legislature of any territory adjoining the limits of any city, incorporated under or accepting the provisions of this title, to the extent of one-half mile in width, shall vote in favor of becoming a part of said city, any three of them may make affidavit to the fact, to be filed before the mayor, who shall certify the same to the city council of said city. The said city council may by ordinance receive them as part of said city; from henceforth the territory so received shall be a part of said city."

In 1912 an amendment of section 5, article 11, of the Constitution of Texas, commonly known as the "Home Rule Amendment," was adopted, which reads as follows:

"Cities having more than 5,000 inhabitants may, by a majority vote of the qualified voters of said city, at an election held for that purpose, adopt or amend their charters, subject to such limitations as may be prescribed by the Legislature, and providing that no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the state, or of the general laws enacted by the Legislature of this state."

Appellants contend that this provision of the Constitution, expressly prohibiting the insertion in a city charter of any provision inconsistent with the general laws, was a direct prohibition against the city of Houston to provide in its charter, by amendment, for the extension of its boundaries in any manner or over a greater area than as provided by general law; and that as the manner of the extension of boundaries and the area over which such boundaries might be so extended were prescribed by general law, viz., article 781, Revised Statutes of 1911, the attempted extension by the city in any other manner than that prescribed in said article, was illegal and void.

We shall not pause to determine whether the article quoted applies to the manner of extending the boundaries of cities incorporated by special act of the Legislature. It will be noted that title 18, Revised Statutes of 1895, relating to cities and towns, provides the method by which they may be incorporated, and prescribes their powers and the duties of its officers. It will be observed that the article quoted provides the method by which territory adjoining the limits of a city "incorporated under or accepting the provisions of this title," may become a part of such city. It may be that a city incorporated by a special act and not under the general laws, which should, by an amendment to its charter, enlarge its boundaries, should not be controlled by the provisions of article 574, which prescribes the manner in which a city incorporated under the provisions of title 18 may acquire additional territory, and that such an amendment would not be inconsistent with any general law of the state that is applicable to such a city. But this is a question that is not necessary for us to now decide. But if we should assume that article 574 was the only general law which prescribed the method by which a city of either class might extend its boundaries, then we think that any city, whether incorporated by special charter or under the general law, would be bound thereby, and that any provision of a city charter or of an ordinance which undertook to provide a different means of extending the city limits than that therein provided, would be inconsistent therewith, illegal and void. But is the article in question the only general law upon the subject? In 1913, before the adoption by the city of Houston of the amendment to its charter whereby its boundaries were extended, the Legislature adopted an enabling act to put into effect the above-quoted amendment to the Constitution (Acts 1913, p. 307), wherein it is provided:

"That by the provisions of this act it is contemplated to bestow upon any city adopting the charter or amendment thereunder, the full power of local self-government, and among the other powers that may be exercised by any such city the following are enumerated for greater certainty; * * * the power to fix boundary limits of said city, to provide for the extension of said boundary limits and the annexation of additional territory lying adjacent to said city, according to such rules as may be provided by said charter."

This act was in full force at the time the city of Houston adopted the amendment to its charter extending its boundary limits and annexing the additional territory. Being a general law it superseded article 574 (article 781, R. S. 1911) as applied to cities which, under the home rule amendment, had adopted or amended its own charters, and the amendment to the charter by which the city limits were extended was not only not inconsistent "with the Constitution of the state or of the general laws enacted by the Legislature," but in harmony with the general law above referred to as the "Enabling Act."

[2] Appellants contend that the adoption by the city of the amendment to its charter, whereby a large section of the adjoining territory was annexed, is, in its essence, the adoption of a charter and the erection of a new city, which consisted of Houston as formerly bounded and the new limits, and they contend, in this connection, that the charter could not be adopted under the terms of the Constitution, unless an election were held within the limits of the whole city, both the old limits and the new; and that the home rule enabling act of the Legislature made no provision for holding such an election. They argue, in this connection, that to erect and create a territory into a municipal corporation, without taking an election of such territory to determine their consent, is an act which can be done only by the Legislature by virtue of its sovereign legislative authority, and that such authority cannot be delegated by the Legislature to third persons. We think it is sufficient to say, in answering this contention, that the Legislature not only may originally fix the limits of the corporation, but it may, in the absence of any constitutional restriction, authorize the annexation of additional territory, and this without the consent, and even against the remonstrance, of the majority of the persons residing in the corporation or in the annexed territory. 1 Dill. Mun. Corp. (5th Ed.) pp. 615, 617; Graham v. City of Greenville, 67 Tex. 62, 2 S. W. 742. In the case cited it is said that the power of the Legislature to extend the limits of a city so as to include adjoining territory is not restrained by the Constitution. It follows that as the Legislature can delegate its power to extend the corporate limits so as to annex additional territory without the consent, and even over the remonstrance, of a majority of persons living therein, and that as the Legislature has so delegated its power to the city of Houston, as we have heretofore endeavored to show, its act in so annexing the new territory is valid, whether it be regarded as extending the corporate boundaries only, or the erection or creation of a new city.

[3] And it is no constitutional objection to the exercise of this power of compulsory an-

nexation that the property thus brought within the corporate limits will be subject to taxation to discharge a pre-existing municipal indebtedness, since this is a matter which, in the absence of special constitutional restrictions, belongs to the Legislature to determine. 1 Dill. Mun. Corp. p. 617.

[4] If we are wrong in all the conclusions heretofore stated, we think that the injunction was properly refused on another ground. It is shown by the testimony that after the amendment of the charter of the city of Houston, extending the boundaries, the city, acting as a city within its new boundaries, assumed and exercised governmental control over both the old and the new territory, performing its duties toward all the inhabitants thereof, and exacting of all the people therein that need of duty owing by a people to the local government; and if the limits were unlawfully extended and the added territory unlawfully annexed, nevertheless the corporation, extending throughout the entire territory, was a de facto municipal corporation, and being such was not subject to the attack made against it by private citizens, the plaintiffs in this case; for this can only be done by quo warranto in behalf of the state. In Graham v. Greenville, 67 Tex. 69, 2 S. W. 742, the Supreme Court expressly declared that whether the boundaries of a city had been extended improperly or not, the question could not be raised in a collateral proceeding, but could only be taken advantage of by the state in a direct proceeding. In City of El Paso v. Ruckman, 92 Tex. 89, 46 S. W. 25, our Supreme Court said:

"The rule is well established that when the creation of a public corporation, municipal, or quasi municipal, is authorized by statute and a corporation has been organized under the color of such authority, its corporate existence cannot be inquired into by the courts in a collateral proceeding. The validity of the incorporation can only be determined in a suit brought for that purpose in the name of the state or by some individual under authority of the state, who has a special interest which is affected by the existence of the corporation."

In Parker v. Harris County Drainage District, 148 S. W. 351, in which the legality of the incorporation of a drainage district was attacked by individuals, this court, speaking through Associate Justice Reese, said:

"It is a firmly established doctrine that when the law provides for the creation of such districts by the action of any public body, as the commissioners' court in the present drainage law, the validity of such action in the creation and organization of such districts cannot be questioned except by a direct proceeding in quo warranto, at the suit of the state, for mere irregularities in, or failure to comply with, the prescribed procedure."

In Carthage v. Burton, 51 Tex. Civ. App. 195, 111 S. W. 440, this court gave the following as the correct rule:

"Even if a municipality has been illegally constituted, the state alone can take advantage of the fact in a * * * proceeding instituted for the purpose of testing the validity of its charter. When the question arises collaterally the courts will not permit its corporate charac-

ter to be questioned, if it appear to be acting under color of law and recognized by the state as such."

See, also, Gibbons v. Ross, 167 S. W. 21.

It seems clear to us that if the extension of the boundaries of the city of Houston, in the manner and under the authority shown, has not resulted in creating a de jure corporation coextensive with the boundaries defined in the amended charter, it has certainly created a de facto one, which is exercising all the functions of city government throughout such limits, with the consent and acquiescence of the state, and under its authority, and the question being political and not one of property, a court of equity will not interfere at the instance of a citizen; for the matter is one to be determined, if at all, by the state in a suit of quo warranto and not otherwise.

[5] And we think the action of the court in refusing to grant the injunction prayed should be sustained upon a further ground, viz., upon the doctrine of "balance of convenience." The doctrine is thus stated in 1 Joyce on Injunction, § 25:

"Where the rights of the parties are doubtful, the court applied to for an injunction should look at the balance of convenience, and act upon the consideration of the comparative inconvenience which may arise from granting or withholding the injunction. In this connection," says the author, "it is said in a recent case: 'In a doubtful case where the granting the injunction would, on the assumption that the defendant ultimately will prevail, cause greater detriment to him than would, on the contrary assumption, be suffered by the complainant, through its refusal, the injunction should usually be denied. But where, in a doubtful case, the denial of the injunction would, on the assumption that the complainant will prevail, result in greater detriment to him than would, on the contrary assumption, be sustained by the defendant through its allowance, the injunction usually should be granted. The balance of convenience or hardship ordinarily is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing a preliminary injunction.'"

This rule is quoted with approval by this court in Jeff Chaison Townsite Co. v. McFaddin, Wiess & Kyle, 56 Tex. Civ. App. 611, 121 S. W. 720, and applied in Matagorda Canal Co. v. Markham Irr. Co., 154 S. W. 1176, and Houston Electric Co. v. Glen Park Co., 155 S. W. 965. Of course this rule should not be applied where the right to injunctive relief is clear and the complainant has no adequate remedy except by restraining the act complained of. It seems to us that the rule applies in full force under the facts of this case, for if it be a fact that the amendment to the charter extending the boundaries of the city so as to include complainants' property and subject the same to the payment of city taxes, is unconstitutional and void as claimed by plaintiffs, or that such property is not for any reason subject to city taxation, the plaintiffs may successfully resist the payment thereof when payment is sought to be enforced (Parks v. West, 102 Tex. 11, 111 S. W. 726); whereas,

to grant the injunction, at this time, a great city would be throttled in its activities and denied the right to make great public improvements, determined by the city and by a majority of its property taxpaying citizens to be necessary.

We may add that the question of taking property without due process of law is not legitimately involved in any of the questions presented upon this appeal.

We shall not prolong this opinion by an extended discussion of the other points presented by appellants, but shall state our conclusions as briefly as we may.

[6] We think it clear that the appellants were not entitled to the injunction prayed to compel the city to restore to the sinking fund of its prior bond issue the amount that had been wrongfully applied to other uses, and to restrain the city from issuing the new bonds until said sum had been restored. The misapplication of money collected for a specific purpose to other uses was wrongful, and the misapplication of it must be condemned. But the right of a city to issue bonds when authority to do so is conferred by the qualified voters, is a right given by law, and when the city, in the exercise of its discretion, has determined that the issuance of bonds is necessary, and when the voters have given permission for their issuance, the right and power is not destroyed by reason of some unauthorized act by the city in the matter of misapplying funds theretofore collected to redeem a prior issue of bonds. When these bonds mature the holders of them have the undoubted right, in a proper way, to compel the city to pay them, but the appellants are not suing as, nor are they shown to be, holders of said bonds, nor have any of said bonds matured. The principle of equity that would restrain a defaulting trustee from the further discharge of his trust until he made his default good, or that would require his removal altogether, has no application to a municipal corporation exercising sovereign powers delegated to it by the Legislature, nor can it be invoked by others than the beneficiaries of the trust.

[7, 8] But the appellants contend that the court erred in not enjoining the proposed issues of bonds because the questions submitted to the people in the bond election were for the issue of the whole of each issue of bonds as units, either now or in the immediate future, no one issue of bonds being given precedence over another, and because, further, that such bonds cannot be lawfully issued for the reasons: (1) That the city has not taxable values to authorize their issuance in accordance with the Constitution, and (2) that the city cannot issue a less amount of any particular class of bonds than that submitted to the people in the election, as no such improvement was submitted to the people and authorized by them.

The issues submitted to the people in the election were of five different sets of bonds, aggregating $5,450,000 in amount. There was nothing in the questions submitted to the voters to indicate that the bonds would be issued in annual installments running for a period of five years; but such was the intention of the city authorities, and this intention was expressed by the publication thereof in a newspaper of wide circulation in the city of Houston, and must have been known to the people who, and at the time they, participated in the election. There is no question that the margin of taxing power of 15 cents of each $100 of taxable property in the city available to the city after making provision for the payment of the interest upon, and the creation of a sinking fund sufficient to redeem the existing bonds at maturity, is not sufficient as a basis for the issuance of the entire issue of the proposed bonds, and therefore under article 11, section 5 of the Constitution the full amount of the proposed bonds could not lawfully issue at one time. But it is not questioned that there is a sufficient margin of taxable values and taxing power, as a basis for the issuance of the first installment of the bonds that the city proposed to issue. The question presented by this state of fact, then, is whether the city can lawfully issue the bonds in annual installments, running for a period of five years? We think the answer should be in the affirmative, provided that at the time of issuing each installment the city has available a margin of taxing power and property values sufficient to raise, by taxation, the sum of money necessary to pay the interest upon and to create a sinking fund of at least 2 per cent. for the redemption of such installment at maturity. In City of Austin v. Valle, 71 S. W. 414, the Austin Court of Civil Appeals, in an opinion written by Associate Justice Streetman, passed directly upon this question, and a writ of error was denied by the Supreme Court. We quote:

"We do not hold that the voters of a city could give their consent to the issue of an unlimited amount of bonds, and that the council might at any time thereafter act on such consent and issue bonds up to the limit of the taxable values of the city. But we believe that when a large public enterprise is contemplated, which will require several years for its completion, the people, by an election, may authorize their council to issue bonds for the purpose, and that the bonds need not be issued at one time, but as the demands of the work may require; and if the taxable values increase, so that the indebtedness actually outstanding against the city at no time exceeds the limit prescribed by law, that the bonds will be valid, although the bonds would have been excessive if all of them had been issued at the time the election was held. We cannot see that such a course violates any provision of the Constitution or the charter. The consent of the voters has been obtained, it has been acted upon within a reasonable time, and, when the debt was created, the provision for its payment could be made, * * * as required by the Constitution."

The court, after holding that neither the holding of the election, nor the passing of the ordinance providing for the issuance of bonds, nor the preparation, signing and sealing of the bonds created any obligation or debt within the meaning of the Constitution, and that the debt was not in fact created until the bonds had been sold and delivered to the purchaser, further says:

"It is earnestly insisted that because, at the time the election was held, the city could not lawfully have issued the full amount of the bonds voted on, for this reason it was impossible for the voters to give their consent to the issue of the bonds. If it was not lawful for them to give their consent, it was because of the prohibition in the Constitution; but, as we have seen, this prohibition relates only to the time when the debt is created, and this is not done until the bonds are delivered as obligations against the city. We are of the opinion that, although the taxable values may not be sufficient at the time the election is held, yet if, at the time the bonds actually become debts against the city, the taxable values are sufficient to pay the interest and provide the sinking fund, the bonds will be valid."

In Wells v. City of Sioux Falls, 16 S. D. 547, 94 N. W. 425, the Supreme Court of South Dakota says:

"The contention that the defendants are without power to issue these bonds to the amount of $50,000, because the proposition submitted to the voters provided for 'issuing bonds to the extent of $210,000,' is untenable, especially as it appears that they intended to issue the remaining portion as they may be required by the contemplated municipal improvement. The mere statement of the contention is sufficient to show its fallacy. It would be contrary to the dictates of reason to hold that the city authorities are bound to sell more bonds than are needed for the intended purpose, or that they are required to dispose of all of them at one and the same time."

We have carefully read the lengthy and interesting brief of the able counsel for appellants, but we cannot agree to any of their contentions to the extent of holding that the injunction prayed was improperly denied. We have concluded that the judgment refusing to grant the injunction should be affirmed, and it has been so ordered.

Affirmed.

PLEASANTS, C. J., not sitting.

⬤⟲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes