## CITY OF BELTON v. HARRIS TRUST & SAVINGS BANK et al. (No. 6885.)

(Court of Civil Appeals of Texas. Austin. April 1, 1925. Rehearing Denied May 27, 1925.)

1. **Municipal corporations ☞907—Limitation on total amount of municipal bond issues held not repealed.**

Rev. St. art. 879, limiting total amount of municipal bond issues to 6 per cent. of taxable values, was not repealed by article 882, limiting indebtedness to an amount, interest and sinking fund on which could be discharged by a tax of 25 and 15 cents on the $100 valuation.

2. **Schools and school districts ☞101—Constitutional limitation on city's taxing power does not apply to its taxing power as an independent school district.**

Const. art. 11, § 5, limiting taxes assessable under home rule charters to 2½ per cent. of taxable property of city, does not limit taxes which city may levy as an independent school district, which are governed by article 7, § 3.

3. **Schools and school districts ☞101—Charter provisions limiting taxation held not to limit taxation for school purposes.**

Belton City Charter, authorizing annual levy of not to exceed $1.50 on the $100 valuation, held to relate to taxation for general municipal purposes under the home rule amendment, and not to limit city's taxing power as an independent school district.

4. **Municipal corporations ☞915—Limitation of bond issues by city under charter stated.**

Under Home Rule Enabling Act, § 4 (Vernon's Sayles' Ann. Civ. St. 1914, art. 1096d), authorizing cities to issue bonds to amount provided by charter, and Belton City Charter adopting such act, and Rev. St. arts. 762–1096 by reference, but otherwise making no provision as to bonds, held that city may

---

create debts and issue bonds to such an amount that current interest and sinking fund can be discharged by that portion of authorized tax in excess of current needs.

**5. Statutes ⬦⟾219—Construction given to ambiguous statute by head of executive department upheld unless clearly erroneous.**

Where ambiguity exists in a statute, a construction given it even by head of an executive department of state government will be followed and upheld by the courts unless clearly erroneous.

**6. Municipal corporations ⬦⟾917(2)—Certificate of Attorney General approving bond issue conclusive against city.**

In view of Rev. St. arts. 619, 620, 625, *held* that certificates filed by municipality in connection with bond issues, stating amount of city's taxable values, and upon which Attorney General acted in approving bonds, is conclusive against city, and evidence offered by city attempting to impeach such certificates was properly excluded.

**7. Municipal corporations ⬦⟾902—Municipal warrants not negotiable instruments.**

Municipal warrants are not negotiable instruments, further than that title may be transferred by indorsement and delivery.

**8. Municipal corporations ⬦⟾903—Holders of refunding warrants in same position as holders of originals.**

Generally, holders of refunding warrants stand in same attitude as holders of originals, and invalidity of latter can be urged against holder of former, even though he be purchaser without notice of such invalidity.

**9. Municipal corporations ⬦⟾903 — Recitals in ordinances authorizing refunding warrants held to make prima facie case placing burden on city.**

Recitals in ordinances authorizing issuance of refunding warrants, that warrants to be refunded were legally issued, were valid and outstanding obligations against city, claims for which were duly allowed by city council, *held* sufficient to make prima facie case of liability against city, casting on it burden of showing that original warrants were invalid.

**10. Municipal corporations ⬦⟾903—City held not to have sustained burden of proving invalidity of original warrants on which refunding warrants based.**

Where recitals in ordinances, authorizing refunding warrants, made prima facie case of validity of original warrants, *held* that mere proof that records failed to connect refunding warrants with specific warrants theretofore issued was insufficient to overthrow prima facie presumption of validity of original warrants.

**11. Municipal corporations ⬦⟾903—Issuance of two refunding warrants for $500 instead of one for $1,000 mere irregularity not affecting validity.**

Mere fact that two refunding warrants for $500 each were issued in place of one warrant for $1,000, as provided by ordinance, was mere irregularity not affecting their validity or rendering city's obligation to pay them nugatory.

**12. Municipal corporations ⬦⟾276—Natatorium "public utility" authorized.**

A city natatorium *held* a "public utility," for the maintenance of which warrants were properly issued.

Appeal from District Court, Bell County; Cooper Sansom, Special Judge.

Consolidated actions by the Harris Trust & Savings Bank and others against the city of Belton and others. Judgment for plaintiffs, and defendant named appeals. Affirmed.

C. C. Countess, of Belton, and Spell, Naman & Penland, of Waco, for appellant.

O. Maland, of Chicago, Ill., W. P. Dumas, of Dallas, and T. C. Hall and Sam D. Snodgrass, both of Temple, for appellees.

McCLENDON, C. J. The appeal in this case is from a judgment against the city of Belton in seven consolidated suits brought against the city upon certain warrants and bond and warrant coupons, the validity of which constitutes the controversy presented in each of the cases. There was a trial to the court without a jury, in which judgment was rendered in favor of the several plaintiffs for the amounts of the coupons and warrants sued upon, establishing the validity of all the bond and warrant issues brought in question in the litigation, and awarding writs of mandamus against the city officials, requiring the levy and assessment of taxes to satisfy the judgment for the years 1920, 1922, 1923, and 1924. From this judgment the city has appealed.

We have reached the conclusion that all of the bond issues and warrants, the validity of which is questioned, are valid, and that the trial court rendered the proper judgment. We will state so much of the record as we deem essential to a clear presentation of what we regard as the controlling questions in the case. We will first consider the various bond issues, the validity of which is attacked.

Prior to August 21, 1914, the city of Belton was a municipal corporation, incorporated under the general laws of the state, and its power to issue bonds was governed by the provisions of title 22 of the Revised Statutes of 1911. The city had, in November, 1881, assumed control of its public schools as an independent school district, in accordance with the laws governing such matters. On August 21, 1914, the city adopted a charter under the home rule amendment, under which it has been subsequently governed. This charter contains the following provisions:

"Article II.—Powers.

"Section 1. By the legal adoption of this charter, the city of Belton shall be made and constituted a body politic and corporate, and shall possess all powers not inconsistent with this charter and the Constitution and laws of Texas.

"For greater certainty, the following are hereby specially enumerated and referred to as being among the powers which are hereby conferred upon, and which may be exercised by the city of Belton, to wit:

"Section 2. All the powers conferred upon cities and towns by Title 22 of the Revised Statutes of 1911, except as may hereinafter be denied or limited, are hereby conferred upon the city of Belton as fully and completely as if such powers were herein separately enumerated.

"Section 3. All powers mentioned in and under section 4, of the act of the Thirty-Third Legislature, page 310 to 316, entitled 'An act authorizing cities having more than five thousand inhabitants, by a majority vote of the qualified voters of said city, at an election held for that purpose to adopt and amend their charters, etc.,' are hereby conferred upon the city of Belton as fully and completely as if each of said enumerated powers were herein separately enumerated.

"If in any instance there should arise or be a conflict as to powers mentioned and conferred by section Nos. 2 and 3 hereof, then, in such instance, the power or powers mentioned under and conferred by section No. 3 hereof shall take precedence.

"Section 4. It is contemplated and intended by the adoption of this charter to confer, and is hereby conferred, upon the city of Belton, the full power of local self-government and the enumeration of and reference to the powers hereinbefore made, or that hereinafter may be made, shall never be construed to preclude, by implication or otherwise, the said city of Belton from exercising any and all powers incident to the full enjoyment of local self-government, provided that such powers shall not be inhibited by the Constitution of the state of Texas."

"Article XII.—Taxation.

"Section 1. The city shall have the power, and is hereby authorized, annually, to levy and collect taxes, not to exceed one and $50/100$ ($1.50) dollars, on each one hundred dollars, of assessed valuation of real and personal property within the city limits, not exempt from taxation by the Constitution and laws of the state."

"Section 4. All moneys arising from the collection of taxes by the city shall be divided into two funds and be designated as 'general fund,' and an 'interest and sinking fund.' It shall be unlawful to use any money derived from the collection of taxes assessed and collected for any special fund for any purpose than the purpose for which same was levied, assessed, and collected."

"Article XV.—Public Schools.

"Section 1. Means and Methods of Operation and Support.—All laws in force, pertaining to the public free schools of the city of Belton, are hereby retained in full force and effect, and said schools shall be continued, managed, and controlled as heretofore, and the trustees of said public free schools shall be elected according to the provisions of the above mentioned laws retained in full force and effect. Means for the support and maintenance of the public free schools and for the support of procuring grounds and constructing and improving buildings for such public free schools shall be obtained according to the laws now in effect relating to such public free schools."

On the 10th day of December, 1919, section 1 of article 12 was amended so as to raise the amount of tax levy therein authorized from $1.50 to $1.90 on the $100 of assessed valuation of real and personal property within the city.

Subsequent to assuming control of its schools, and at a date not given, but long prior to the time its 1914 charter was adopted, a school maintenance tax was voted of 50 cents on the $100 property valuation; and on May 24, 1924, by a vote of the people, an additional school maintenance tax of 25 cents on the $100 valuation was voted. The record shows that the city issued, after complying with the necessary legal formalities, negotiable coupon bonds in amounts, dates, due dates, and rates of interest as follows:

| Purpose. | Date. | Due Date. | Interest Rate. | Amount |
|---|---|---|---|---|
| Waterworks No. 1 | 7/1/84 | 1929 | 6% | $18,500.00 |
| School No. 1 | 5/1/96 | 1936 | 6% | 4,500.00 |
| School house No. 2 | 7/1/03 | 1943 | 4% | 6,000.00 |
| Waterworks No. 2 | 1/1/11 | 1951 | 5% | 11,000.00 |
| Waterworks Ext. No. 1 | 8/1/13 | 1953 | 5% | 20,000.00 |
| Street imp. | 8/1/13 | 1953 | 5% | 45,000.00 |
| Bridge | 4/1/14 | 1954 | 5% | 30,000.00 |
| School No. 3 | 4/1/14 | 1954 | 5% | 60,000.00 |
| Sewer No. 1 | 1/15/16 | 1956 | 5% | 40,000.00 |
| Street imp. No. 2 | 7/1/19 | 1959 | 5% | 75,000.00 |
| City Park No. 1 | 7/1/19 | 1959 | 5% | 25,000.00 |
| Waterworks Ext. No. 2 | 4/-/20 | 1960 | 5% | 25,000.00 |
| Fire station | 4/-/20 | 1960 | 5% | 25,000.00 |

The suits were brought upon coupons covering all of these issues, with the exception of the first three which antedate January 1, 1911; but the validity of the succeeding three issues (waterworks No. 1 of 1911, and the waterworks and street bond issues of 1913) are admitted to be valid. The validity, either in whole or in part, of the remaining issues beginning with the bridge and school bonds of April, 1914, are all attacked by the city; the ground of attack in each instance being that the city exceeded the limit prescribed by law or its charter, and that to that extent the bonds are invalid.

The city had prepared and properly certified in connection with each of these bond issues a complete record showing the various ordinances calling for and declaring the bond elections, provisions for payment, and all necessary prerequisites to the issues; included in each of which certificates was a detailed list of the city's indebtedness, the amount of tax levied to pay interest and

sinking fund on each item, and "the taxable values of the city as shown by the assessment rolls last approved prior to the date" of the certificate. The certificates relative to the 1914 issues of street bonds of $30,000 and school bonds of $60,000 showed a total indebtedness (exclusive of these issues) of $105,000; and taxable values of $3,800,000.

In connection with these bond issues, the city offered, but the court excluded, the 1913 approved tax rolls, showing total taxable values amounting to $2,356,950. The city also offered in evidence the 1914 tax rolls, which upon objection were excluded by the court. According to the bill of exceptions taken to this ruling, these rolls were approved March 7, 1914, but contained no recapitulation. The total taxable values thus shown were $3,591,552, of which $2,582,355 was on the rendered roll, $161,287 on the unrendered roll, and $847,910 on the supplemental roll.

The certificate upon which the Attorney General based his approval of the 1916 sewer bonds showed a total indebtedness of $223,500 and taxable values of $4,763,000.

The city offered, in connection with this bond issue, the tax rolls for 1915, which were excluded and bill of exceptions taken. From this bill it appears that these rolls were approved August 7, 1915, but contained no recapitulation. These rolls showed a total valuation of $4,579,350, of which $2,543,250 was on the rendered roll, $187,100 on the unrendered roll, and $1,850,000 on the supplemental roll. The certificates on which the Attorney General acted in approving the 1919 bond issue showed a total indebtedness of $364,500 and total taxable values of $4,163,-000.

In connection with these bond issues, the city offered in evidence, but the court excluded, the official tax rolls, approved May 9, 1917, showing total tax value of $2,306,-430, and the official rolls of 1918, which had no recapitulation, and were not approved. These rolls showed a total valuation of $3,-878,060, of which $2,087,340 was on the rendered roll, $223,200 on the unrendered roll, and $1,567,520 on the supplemental roll. The certificates on which the 1920 bond issues were approved showed a total indebtedness of $396,000, and taxable values of $4,163,000.

In connection with all bond issues, the city offered the bond and warrant records, which showed some difference in the amount of indebtedness from that contained in the certificates, but which are immaterial under our subsequent holdings.

Each of these bond issues was approved by the Attorney General, who certified to an examination of the record and to the validity of each issue. Each of the bonds was then registered as required by statute with the state comptroller and sold by the city; and it was admitted that plaintiffs were the owners of such of the bonds and coupons as claimed in their pleadings, and that they bought them in the open market.

It will be observed that, at the time the two 1914 bond issues were passed, the city was incorporated under the general laws then in force, and its taxing powers were limited by Revised Statutes, articles 925 and 2876, under the former of which it could levy on the $100 valuation a tax of 25 cents for current expenses, 25 cents for public improvements, and 15 cents for roads, bridges, and streets; and under the latter 50 cents for school maintenance. Its power to issue bonds was governed and limited by Revised Statutes, articles 879, 882, 924, 925, and 2874. These articles limited the total amount of bonds that could be issued to 6 per cent. of the taxable values, provided that bonds for general public improvements, including school buildings and building sites, should not reach an amount where a tax of 25 cents on the $100 valuation would not pay current interest and sinking fund, and bonds for roads, streets, and bridges should not reach an amount where a tax of 15 cents on the $100 valuation would not pay such interest and sinking fund.

[1] Appellee contends that the provisions of article 879 were repealed by the subsequent articles. As supporting this contention, it is pointed out that that article authorizes bond issues to bear interest at not exceeding 10 per cent., whereas article 882 limits the interest to 6 per cent.; and the former limits the total bonded indebtedness to 6 per cent. of the taxable value, whereas the latter limits such indebtedness to an amount the interest and sinking fund on which a tax of 25 and 15 cents on the $100 valuation will discharge. It may be conceded that the provisions of article 882 limiting the rate of interest to 6 per cent. repealed the 10 per cent. interest limit of article 879. None of the bond issues bore interest greater than 6 per cent., and the question is therefore academic. But there is no inconsistency we think, between articles 879 and 882, with reference to the total amount of bonds authorized to be issued; but each of these articles is a limitation upon such amount. See Palestine v. Royal, 16 Tex. Civ. App. 36, 40 S. W. 621, in which writ of error was refused. Both of these articles were brought forward in the 1911 codification, and unless they are in irreconcilable conflict both should be upheld. The limitations of Revised Statutes, articles 882 and 925, are the same as those contained in the Constitution, section 9 of article 8, at the time the statutory articles were enacted, consequently Revised Statutes, art. 879, would be unconstitutional if it were not construed as a further limitation, since it was beyond the power of the Legislature to authorize a bond issue beyond the constitutional limit. So far as the pres-

ent case is concerned, the question is unimportant. In order for bond issues, to the full limit of the 25 and 15 cents tax per $100 valuation, to exceed the 6 per cent. limit, the current interest and sinking fund must be less than 6⅔ per cent. At that figure the limitations in the two statutes would be identical. Figuring the sinking fund at not less than 2 per cent., the current interest must therefore not be greater than 4⅔ per cent. Anything below that rate would exceed the 6 per cent. That rate or anything above it would fall within the 6 per cent. limit. Only $6,000 of the debt, which bore 4 per cent. was below this figure; $23,000 bore 6 per cent. and the balance bore 5 per cent. It is clear, therefore, that if the limitations of article 882 were not exceeded, then the 6 per cent. limit of article 879 was likewise not exceeded.

As above stated, the certificate on which the Attorney General acted in approving the bond issues gave the taxable values as $3,-800,000. The city offered to prove that the 1913 rolls showed a total valuation of $2,356,-950, and that the 1914 tax rolls, which were approved before the bonds were issued, but never recapitulated, showed a total valuation of $3,591,552. The contention of the city is that it was not bound by the certificate furnished the Attorney General, and that since the 1914 rolls were not recapitulated, the 1913 rolls were the last properly approved rolls, and must govern in determining the amount of bonds which the city could issue. Appellee contends, on the other hand, that the certificate furnished the Attorney General was conclusive of the matters therein certified, and a purchaser in the open market was not required to go behind the records in the Attorney General's office, if in fact he was required to go behind the Attorney General's certificate, for the purpose of determining whether there had been an overissue of bonds. Taking the amount of indebtedness shown by the city's bill of exceptions, which is slightly in excess of that shown by the certificate, if the 1913 rolls govern, the $30,000 street bonds were excessive to the extent of $223,065.35, and valid to the extent of $6,934.65. Under this theory each of these $1,000 bonds would be a valid obligation for $231.15½. Under the same theory the $60,000 school bonds would be excessive to the extent of $41,823.21, and valid to the extent of $18,176.79; and each $1,000 bond a valid obligation for $302.94. If either the unrecapitulated 1914 rolls or the amount certified to the Attorney General governs, each of these bond issues is valid. As the questions thus raised are also involved in the succeeding bond issues, we will consider them in connection with those issues.

We have seen above the tax and bond limits under which the city operated up to the adoption of the 1914 charter. When that charter was adopted the city became a municipality under the Home Rule Amendment (Const. art. 11, § 5, as amended in 1912), which provides:

"Said cities may levy, assess and collect such taxes as may be authorized by law or by their charters; but no tax for any purpose shall ever be lawful for any one year, which shall exceed two and one-half per cent. of the taxable property of such city."

This provision placed an absolute limitation of not exceeding 2½ per cent. of the taxable values; and granted the power to levy such taxes, within that limit, as might be prescribed either by general law or by charter.

[2] The limitation prescribed in the Home Rule Amendment, however, has no reference to a city's taxing power as an independent school district. The Constitution expressly places no limit on such taxing power. Const. art. 7, § 3, as amended in 1883 and in 1909. A city which constitutes an independent school district has a dual character, namely that which pertains strictly to a municipality, and that which pertains to an independent school district. As to the former its taxing power is governed by article 11, § 5, of the Constitution, and as to the latter by article 7, § 3. This is clearly the holding in Rockdale v. Cureton, 111 Tex. 136, 229 S. W. 852. See, also, Garitty v. Rainey, 112 Tex. 369, 247 S. W. 825. So far as constitutional limitations were concerned, the city could therefore levy not exceeding 2½ per cent. taxes for general municipal purposes, and without limit for school purposes.

[3] The question is therefore presented as to how far these constitutional limitations are further restricted by the charter—a question which presents some difficulty, but which, we think, can fairly be arrived at by a consideration of the various charter provisions and the statutes under which they were adopted.

Section 1 of article 12 of the charter authorizes an annual levy of not exceeding $1.50 on the $100 valuation. The section does not state for what purpose this levy shall be, but section 4 of this article provides that "all moneys arising from the collection of taxes by the city shall be divided into two funds and be designated as 'general fund' and an 'interest and sinking fund.'" It further provides an inhibition against diversion from the fund for which a tax has been collected. It seems too plain for substantial controversy that these provisions relate to taxation for general municipal purposes under the home rule amendment, and have no relation whatever to the city's taxing power as an independent school district, except in so far as its taxing powers to pay its school bonded indebtedness may be construed to be embraced within the "interest and sinking fund." The city, in its character as a school

district, had already voted a school mainte-nance tax of 50 cents on the $100 valuation. If the $1.50 tax limit in article 12, § 1, had been intended as embracing that tax, then section 4 of that article would have provid-ed for a school maintenance fund in addi-tion to a general fund and an interest and sinking fund. But that section provides that "all moneys arising from the collection of taxes by the city shall be divided into" the two funds last named; clearly indicating that the school maintenance tax, theretofore voted, was not embraced in the taxes pro-vided for in this article. Aside from this, however, the public schools of the city are dealt with in article 15 of the charter. That article contains only the one section above quoted. It is very general in terms, and is headed: "Public Schools, Means and Meth-ods of Support." It provides for a continu-ance of all laws pertaining to the city schools, and carries the further express pro-vision that "said schools shall be continued, managed, and controlled as heretofore." Nothing could be plainer, we think, than that article 15 left undisturbed everything that had theretofore been done with refer-ence to the school system of the city, in-cluding the 50-cent school maintenance tax theretofore voted; and that article 12 au-thorized a levy of not exceeding a $1.50 tax for general municipal purposes, which was increased by the 1919 amendment to $1.90.

[4] The further question is presented as to what further limitations, if any, within the $1.50 and $1.90 limit are imposed by the charter upon the city's bond-issuing or debt-creating powers.

Article 2, § 2 of the charter by reference adopts, except as thereafter denied or limit-ed, all the powers conferred by title 22, R. S. 1911. This title embraces articles 879, 882, and 925, the provisions of which have been discussed above. Article 2, § 3 of the char-ter adopts, also by reference, all the powers mentioned in section 4 of the Home Rule En-abling Act (article 1096d, V. S. R. S. of 1914), with the proviso that in case of a conflict be-tween sections 2 and 3 of article 2 of the charter the latter "shall take precedence." Article 1096d, above, grants to home rule cities, among many others:

"The power to issue bonds upon the credit of the city for the purpose of making permanent public improvements or for other public pur-poses in the amount and to the extent provided by such charter, and consistent with the con-stitution of the state; provided, that said bonds shall have been first authorized by a majority vote cast by the duly qualified prop-erty taxpaying voters voting at an election held for that purpose."

It is the contention of the city that, since the provisions of section 4 of the Home Rule Enabling Act just quoted authorize the issue of bonds only to the amount "provided by such charter," and, since the charter nowhere contains any express provision with refer-ence to the issuance of bonds, the limitations of title 22, R. S. 1911 (articles 879, 882, and 925) were made operative by section 2 of ar-ticle 2 of the charter. However plausible this contention may seem, we do not think it is a proper construction of the charter pro-visions. Article 1096d, above quoted from, gives the express power to issue bonds, and refers to the charter for the amount. The charter authorizes tax levies not to exceed $1.50 on the $100 valuation, and this is the only limitation which the charter provides. Reading the charter and article 1096d to-gether, we think they mean that the city can create debts, and issue bonds in payment thereof, to such an amount that the current interest and sinking fund can be discharged by that portion of a tax of not exceeding $1.50 on the $100 valuation which exceeds the amount necessary to pay current expens-es of the city government. This would clearly be the proper construction of the charter in the absence of section 2 of article 2. And since the proviso to section 3 of that article makes the latter controlling in case of conflict, we think the intention is reasonably clear that the powers contained in title 22 were adopted only in those cases where they were absent from section 4 of the home rule amendment.

[5] But even were we inclined, as an orig-inal proposition, to give to these charter pro-visions the construction now contended for them by the city, there are very cogent con-siderations which would impel us not to do so at this time. The instrument to be con-strued is not a legislative act or constitu-tional provision; but a charter which was adopted by the qualified voters of the city. The construction we are giving to the char-ter is that which was necessarily placed on it by the city officials when they called the several bond elections, by the qualified tax-paying voters when these bond elections were carried, and by the Attorney General when he approved the several issues; since some of these bond issues appeared to be excessive from the face of the record certified by the city to the Attorney General, if we were to adopt the city's present contention. By the home rule amendment the city of Belton was given the power to adopt its own charter, subject to constitutional and statutory pro-visions and limitations. Within these provi-sions and limitations it could give itself the power to create debts and issue bonds to the extent given in the construction we are giv-ing to the charter it has adopted. Acting upon that construction it has attempted to exercise a power, which, but for that con-struction, it would not have. Any taxpayer had the right, before the several bond issues were approved, to have their validity tested

by the courts. No question, however, was ever raised in connection with any bond issue until long after the bonds had been approved by the Attorney General, registered by the comptroller, and sold in the open market. It is a familiar rule of statutory construction that, where ambiguity or uncertainty exists, "a construction given it by even the head of an executive department of the state government will be followed and upheld by the courts, unless such construction is clearly erroneous." Koy v. Schneider, 110 Tex. 369, 218 S. W. 479, 221 S. W. 880, and the authorities cited and reviewed both in the original and rehearing opinions. If such rule applies where one department of government has construed a pronouncement, doubtfully expressed, of another department, how much more cogent are the reasons for invoking and applying the rule where a department or subdivision of the government has placed a construction upon its own enactments, under which construction it has obtained money from innocent third parties.

Where a city has not exceeded the constitutional or statutory limitations imposed upon it, and attempts to create a debt by the issuance of bonds which is beyond the limit previously imposed by its self-adopted charter, and these bonds have been sold by the city upon the open market and passed into the hands of bona fide purchasers, it may well be gravely doubted whether the city can thereafter urge invalidity of the bonds on the ground of exceeding the charter limit, upon the principles of estoppel. But since, in any event, the construction placed by the city on the charter is doubtful, we prefer to place our decision upon the above holdings, rather than upon estoppel.

[6] The remaining questions presented in connection with the bond issues relate to the character of proof which may be resorted to in determining whether the city has exceeded its debt creating powers. If the certified records furnished by the city to the Attorney General in connection with the several issues are conclusive and binding on the city as to the amount of its taxable values, then there is no excess in any of the bond issues. If such records are not conclusive, then the further question is presented whether approved, but unrecapitulated, rolls are proper evidence of taxable values for this purpose. This latter question affects the validity of the 1914 bonds, and their validity would affect the city's subsequent total indebtedness, and therefore likewise affect the subsequent bond issues. Since we have concluded that the certified records upon which the Attorney General approved the several bond issues is conclusive, a decision of the latter question is unnecessary; and it is also unnecessary to make the detailed calculation showing how each bond issue would be affected under the several contentions of the city.

Articles 619, 620, and 625, R. S. of 1911, we think resolve the question of the conclusiveness of the certified records under which the bonds were approved. These articles provide:

"Art. 619 (918d). *Conditions Precedent to the Issuance of Bonds; Examination by Attorney General, etc.*—Any county, city, or town in the state of Texas, desiring to issue bonds as authorized by the Constitution and laws of this state, shall, before such bonds are offered for sale, forward to the Attorney General the bonds to be issued, a certified copy of the order, or ordinance, levying the tax to pay interest and provide a sinking fund, with a statement of the total bonded indebtedness of such county, city, or town, including the series of bonds proposed, and the assessed value of property for purposes of taxation, as shown by the last official assessment, of such county, city or town, together with such other information as the Attorney General may require; whereupon it shall be the duty of the Attorney General to carefully examine said bonds in connection with the facts and the Constitution and laws on the subject of the execution of such bonds, and if, as the result of such examination, the Attorney General shall find that such bonds were issued in conformity with the Constitution and laws, and that they are valid and binding obligations upon such county, city, or town, by which they are executed, he shall so officially certify."

Article 620 provides for registration of the bonds with the comptroller, in a book kept for that purpose, after they have been approved by the Attorney General and his certificate attached thereto.

"Art. 625 (918f). *Certificate of Attorney General and Registration Prima Facie Evidence of Validity.*—Such bonds, after receiving the certificate of the Attorney General, and having been registered in the Comptroller's office, as provided herein, shall thereafter be held, in every action, suit, or proceeding in which their validity is or may be brought into question, prima facie valid and binding obligations. And in every action brought to enforce collection of such bonds, the certificate of the attorney general, or a duly certified copy thereof, shall be admitted and received in evidence of the validity of such bonds, together with the coupons thereto attached; provided, the only defense which can be offered against the validity of said bonds shall be for forgery or fraud. But this article shall not be construed to give validity to any such bonds as may be issued in excess of the limit fixed by the Constitution, or contrary to its provisions, but all such bonds shall, to the extent of such excess, be held void."

All the requirements of articles 619 and 620 were complied with, as to each issue of bonds, with scrupulous punctilio.

The Constitution places no express limitation upon the amount of indebtedness a home rule city may create but limits the amount of

taxes such cities may lawfully levy and collect in any one year to 2½ per cent. of the taxable values. It also provides that no debt shall be created unless at the time provision be made to assess and collect annually a sufficient sum to pay the interest and create a sinking fund of at least 2 per cent. This necessarily limits the amount of debt which can be created to such a sum, the interest and sinking fund upon which in addition to current expenses of the city can be discharged by a tax of not exceeding 2½ per cent.

Within this 2½ per cent. tax limit there is a grant of power to collect such taxes "as may be authorized by law or by their charters." It requires a course of reasoning which some might regard as circuitous and labored to construe this language as prescribing a further limitation. But even so regarded, it requires further reasoning, equally open to question, to reach the conclusion that it comes within the meaning of the expression "the limitation fixed by the Constitution," used in article 625.

On the other hand, it may be contended, with much reason, that the power of these cities to create debts and issue bonds is derived from the Constitution and laws upon the subject, and as these enactments point out the means by which the limitations they impose may be arrived at, every one dealing with such securities is charged, as a matter of law, with a knowledge of the limitations thus imposed.

The fact has already been adverted to that there has been no legislation limiting the amount of bonds a home rule city may issue or of taxes it can levy (within the Constitution); the fixing of such limitations being expressly delegated by the Legislature to such cities themselves to regulate by charter enactment. And it may be urged with much force that the city would be estopped to raise the issue of exceeding a limit thus self-imposed. Without attempting to determine these questions, we pass to what we regard as the controlling issue in the case: Whether the city is concluded as to the amount of taxable values by the certificate it filed with the Attorney General upon which he acted in approving the bonds.

Article 625 clearly provides that the approval of the Attorney General shall not preclude inquiry into whether the constitutional limit has been exceeded; and the only question to determine is the character of evidence by which the city is permitted to show such excess. The approved rolls of the city of course furnish the original evidence of such valuation, and, in the absence of article 619, 620, and 625, those rolls would be conclusive. Bank v. Terrell, 78 Tex. 450, 14 S. W. 1003. The purpose of those articles was twofold. On the one hand it was to give protection to the taxpayers against the imposition of burdens upon their property which had not been legally imposed, by having their rights investigated and passed upon by the highest legal officer of the state before the bonds passed into the hands of those against whom otherwise valid defenses might not avail. On the other hand, it was to protect purchasers and give to this character of municipal securities a stability which would be "in aid of their negotiability" (Lasater v. Lopez, 110 Tex. 186, 217 S. W. 373, 376) by enhancing their value and affording for them a sure and ready market. The credit of the municipalities of the state would thereby be enhanced, and their bonded securities more easily floated.

There have been many decisions of our courts, state and national, involving the question of overissue of municipal securities, in which the effect of recitals in the securities, or in ordinances or certificates of officials as to their validity, has been determined. Many of these cases have been cited and reviewed by counsel for the respective parties to this litigation. Conflicts in decision have often arisen, as would naturally be expected where the litigation has been so prolific. We think it would not serve to clarify the question before us to attempt an extended citation or review of these cases. The opinion in the recent case of Dietrich v. Bath County (D. C.) 292 F. 279, reviews the leading cases by the Supreme Court of the United States upon the question of what recitals in such bonds bind, and what do not bind the municipality. The general rule which the learned judge who wrote the opinion draws from these decisions is thus stated:

"I gather, therefore, from this that, if provision is not made for the ready ascertainment of the truth as to a fact whose existence is essential to the issuance of bonds, authority on the part of the officers having authority to issue them to determine and to make a statement by way of recital in the bonds as to the existence of such fact will be implied, and the municipality whose bonds are thus issued will be estopped to dispute the truth of the recital as against a bona fide purchaser for value.

"The sum of the principles applied and recognized in these cases is this: A municipality is so estopped where the recital is broad enough to cover the essential fact if there is authority on the part of the officers authorized to issue its bonds to make the recital. It is not estopped if the recital is not broad enough or if there is not authority to make it. And authority to make it will be implied if no provision is made for a purchaser readily ascertaining the truth in regard thereto."

Applying this test to the certificates which the city officials furnished the Attorney General, and upon the facts contained in which he approved the bonds, we think there can be little, if any, room to doubt that those certificates were binding upon the city, and were not open to contradiction for the purpose of invalidating the bonds in the hands of a bona

fide holder. The city officials were not only authorized, but it was made their duty, to certify to the Attorney General the facts upon which alone the extent of the city's debt creating power depended, and this for the very purpose of making a record from which he could determine every question touching the validity of the bonds. His certificate, based upon this record, was required to be attached to the bonds, and they must then be registered with the comptroller before they could be negotiated. Certainly it was not the duty of the Attorney General to make a personal investigation of the city's records in order to determine whether the record furnished him by the duly authorized city officials under mandatory provisions of law was correct. And if such duty did not rest upon the Attorney General, why should it be imposed upon a purchaser? One of the leading purposes of article 625 was to make this character of municipal securities an attractive investment upon the money markets of the country by making it noncontestible, except in so far as would be absolutely necessary to protect the taxpayer in the four respects enumerated in the article. The record filed with the Attorney General furnished a ready means for ascertaining the truth in this regard. Every fact necessary to its ascertainment was contained in that record. Every essential safeguard was afforded the taxpayer in the provisions for this record. If he could not trust the officials charged with these duties, it was as much his duty to inquire into the correctness of the record certified as it was of a purchaser of the bonds, and the means of such inquiry were more readily at hand for him than for purchasers scattered throughout the country. To require the purchaser to make this inquiry, thus charging him, as a matter of law, with knowledge of every inaccuracy in the record which might have effect upon whether the debt creating power had been exceeded, would defeat the primary object of the statute. It would cast a doubt upon the validity of all bonds issued by municipalities in the state, and render their negotiable qualities precarious.

It is our conclusion that the evidence offered by the city, attempting to impeach the certificates upon which the bonds were approved in the matter of the amount of taxable values, was properly excluded; and all assignments of error questioning the validity of the several bond issues are overruled.

The three issues of warrants involved in the litigation are refunding warrants as follows: 1915 series of $15,000; 1916 series of $12,000, and 1923 series of $20,000. Each series was issued under an ordinance, duly enacted by the city, which contained detailed recitals of the purpose and validity of the issue, form of the warrants and coupons, provisions for payment, etc. The recital as to the purpose and validity of the 1915 warrants reads:

"That warrants of said city to be called city of Belton funding warrants, second series, be issued under and by virtue of the Constitution and laws of the state of Texas, for the purpose of funding an equal amount of the warrants of the city duly and legally issued, and which are valid, subsisting and now outstanding obligations against said city, the claims for which were duly audited and allowed by the city council prior to their issuance, and which are to be cancelled and surrendered and the warrants hereby authorized issued to the holder in lieu thereof, which said original outstanding warrants are as follows:"

The same recital is made in the ordinances authorizing the other issues. In the 1915 ordinance the warrants refunded are not described further than that they were issued to "First State Bank." The 1916 ordinance lists the warrants refunded by number, date, holder, and amount, but does not show their purpose. In the 1923 ordinance the warrants refunded are listed by number, date, payee, purpose, and amount. There are approximately 440 of these warrants, numbered from 237 to 676, ranging in amount from $1 up to several hundred dollars, with the exception of. No. 657 to the Bastrop Lignite Company, for "coal account," which is for $1,592.70. The items listed under "purpose" for which the warrants were given include a variety of subjects such as salary of various officials, labor, insurance, and various supplies of the character one would expect to find in the usual course of management of a municipality of this kind. These ordinances were all passed upon by J. T. Sluder, an attorney experienced in such matters, who acted for the purchasers of the refunding warrants. There was no proof of the original warrants, outside of the recitals in the refunding ordinances, except some testimony of city officials to the effect that the refunding warrants were issued to take up warrants which the city had previously issued for various purposes, and for which the city had received either money, labor, or supplies, and that the money paid for the refunding warrants was used by the city in taking up the original warrants. W. P. Dumas, an attorney for the warrant holders, testified that he made several trips to Belton and searched the minutes of the city council in company with the city attorney, and that "all the information we found relative to these two warrant issues (the 1915 and 1916) were the two ordinances" authorizing their issue.

The city contends that the burden of proof was on the plaintiffs to show that the original warrants, for which the refunding warrants were issued, were valid obligations against the city, and no showing to that effect was made, and that the recitals in the refunding ordinances and warrants as to their validity were not binding on the city.

[7] That municipal warrants are not negotiable instruments within the law merchant, further than that title may be transferred by indorsement and delivery, is well settled. Lasater v. Lopez, above.

[8] The appellees contend that the city is estopped by the recitals in the warrants and the ordinances authorizing them from showing that the original warrants were invalid. The chief authority relied upon is the recent federal case of Slayton v. Panola County (D. C.) 283 F. 330. In that case the order of the commissioners' court, purporting to authorize the original warrants, showed that they were issued for a purpose authorized by law, and the federal court held that the county was estopped from showing a secret purpose on the part of the county commissioners to divert the proceeds to a purpose for which the debt creating power had been exhausted. The facts there present quite a different case from the one we are considering. The general rule, which seems well established, is that holders of refunding warrants stand in the same attitude as holders of the originals, and invalidity of the latter can be urged against a holder of the former even though he be a purchaser without notice of such invalidity. Lasater v. Lopez, above; see, also, Grimes County v. Slayton (Tex. Civ. App.) 262 S. W. 209, for a list of authorities upon this subject. We have grave doubts, therefore, whether the city would be precluded by the recitals named to set up invalidity in the original warrants.

[9, 10] But we are clear in the view that the recitals in the refunding warrants and ordinances were sufficient to make a prima facie case of liability against the city, which cast upon it the burden of showing that it had exceeded its power in enacting the ordinances and issuing the warrants. The city had the power, generally, in the conduct of its affairs, to issue warrants in payment of its current expenses. It was not even necessary that warrants of this character be authorized by ordinance. The recitals in the refunding ordinances to the effect that the refunded warrants were "duly and legally issued, were valid, subsisting, and now outstanding obligations against the city, the claims for which were duly audited and allowed by the city council prior to their issuance," were sufficient to cast upon the city the burden of showing they did not speak the truth. This burden was not met by a showing that a search of the records failed to connect up the refunding warrants with some previous minute entered by the council. Mere failure on the part of the city to so keep its records as to be able to trace refunding warrants into specific warrants theretofore issued would not support an affirmative finding that the original warrants were invalid. The proof contained in the record fell short of that sufficient to overthrow the prima facie presumption of validity made by the recitals in the refunding ordinances. 2 Dillon on Municipal Corporations (5th Ed.) § 855, and list of authorities there cited. The cited section from Dillon reads:

"County and city orders signed by the proper officers are prima facie binding and legal. These officers will be presumed to have done their duty. Such orders make a prima facie cause of action. Impeachment must come from the defendant."

Not only were the warrants signed by the proper city officers, but the ordinances authorizing their issue were duly passed by the city council, and the validity of the original warrants was therein recited.

[11] Objection was made to the introduction of the 1915 warrants on the ground that they were in denominations of $500 each, whereas, the ordinance provided that they should be $1,000 each. In all other respects the warrants were in accordance with the ordinance authorizing them. This objection is without substance and is overruled. The fact that two warrants for $500 each were issued in place of one warrant for $1,000, was a mere irregularity which could not affect the validity of the warrants, or render the city's obligation to pay them nugatory. It was clearly a clerical error, which, if need be, might be corrected in a proper proceeding for that purpose. It in no way affected the amount, due date, or rate of interest of the obligation, or the judgment properly to be rendered in the case.

[12] As to the 1923 warrants, the further contention is made that they were invalid to the extent of certain original warrants, which, according to the list embraced in the refunding ordinance, were for the purpose of maintenance of the city natatorium; the contention in this regard being that the city had no power as a municipal corporation to incur expense, create a debt, or levy taxes for such purpose. This contention was made in City of Belton v. Ellis (Tex. Civ. App.) 254 S. W. 1023. It was overruled by this court, and writ of error refused. In disposing of the question, which was the controlling one in the case, this court, speaking through Associate Justice Jenkins, said:

"We hold that the facts in this case show that the bathing pool was a public utility, and that the city was authorized under its charter to operate the same."

We hold that the trial court did not err in his rulings respecting these warrants or in rendering judgment thereon.

The assignments of error, questioning the action of the trial court in awarding writs of mandamus to compel the levy of certain taxes for the years 1920, 1922, 1923, and 1924, to satisfy the judgment upon the several bond coupons, and warrant and warrant coupons, are predicated upon the propositions that the

$1.90 tax authorized in the charter amendment of 1919, included the school maintenance tax, and that the limitations contained in R. S. arts. 879, 882, and 925 were applicable after adoption of the 1914 charter. For the reasons above stated, these assignments are overruled.

The trial court's judgment is in all things affirmed.

Affirmed.