NASHVILLE, C. & ST. L. RY. *v.* BAKER, COM'R, *et al.*

*(Nashville,* December Term, 1933.)

Opinion filed May 19, 1934.

Roy H. Beeler, Attorney-General, and Edwin F. Hunt, Assistant Attorney-General, for the State.

Fitzgerald Hall, of Nashville, for appellee.

Mr. Justice Cook delivered the opinion of the Court.

By chapter 132, Public Acts of 1921; chapter 35, Public Acts of 1923; chapter 88, Public Acts of 1925; Code, section 2638 et seq., it was provided that—

"The state department of highways through its commissioner, shall have the power to eliminate grade crossings of any railroad or interurban railway track on any of the main traveled roads designated by the commissioner as included in the general highway plan of the State,

whenever, in the discretion of the said commissioner, the elimination of any such grade crossing is necessary for the protection of persons traveling on any such highway or any such railroad." Code, section 2638.

"When any such grade crossing is ordered to be eliminated, the commissioner shall determine the location of the crossing to be substituted and the grade thereof whether it shall pass over or under the railroad tracks." Code, section 2639.

By subsequent provisions of the statute (Code, sec. 2642), the railroad is required to bear half the expense of eliminating the grade crossing, and right of appeal is given the railroad to have the action of the commissioner reviewed by the Railroad and Public Utilities Commission.

The state department of highways constructed Highway No. 20 from Hohenwald, in Lewis County, through Henderson County, to a highway connection in Madison County, and, pursuant to the statute, required the railroad to share the cost of eliminating a grade crossing at Lexington, in Henderson county. The bill was filed by the railway to avoid the action of the state highway department upon the theory:

(1) That the construction of the highway, its routing through Lexington, and the underpass at the railroad crossing, were not designed to meet local transportation needs, but to supply a link in a nationwide system of highways; and the State was not exercising its power in applying to this situation the statute for the elimination of the grade crossing, but was acting in obedience to plans of the Federal government designed to create a nationwide superhighway system.

(2) That, under modern transportation and economi:

conditions, chapter 132, Public Acts 1921, is violative of the organic law, both State and Federal, and, under the facts shown by the record, the statute, properly constructed and applied, is not enforceable against the railway, because the highway department, by its action, merely created an additional crossing, without eliminating old ones, in obedience to the requirements and in conformity with the regulations of the Federal Bureau of Highways.

The chancellor found that the underpass at Lexington was necessary, was properly located, and constructed at a reasonable cost of $17,400. He said that under ordinary circumstances the statute, chapter 132, Public Acts 1921, would be applicable to that situation, but the state highway department was not exercising power for the State, but was proceeding under and in conformity with the general plan of internal improvement fostered by Congress in conjunction with the several states to make a nationwide system of highways in the interest of interstate commerce by motor vehicles in active competition with railroads. We quote from the conclusion of the chancellor's finding and decree:

"The bill of complaint did not challenge the validity of the Tennessee statutes in question under all conditions but it was frankly admitted in the brief and the argument that they might be valid under certain situations. The challenge here was only when there exists such a situation as presented by the bill of complaint and the testimony. The court is of the opinion that the challenge to the validity of these statutes, under these particular conditions, on the several grounds set out in the bill of complaint, is sound and that said statutes are, under such conditions, in violation of both the

Constitutions of the State of Tennessee and of the United States and that the order of the Highway Commissioner of Tennessee supposedly made pursuant to those statutes is also invalid on that account; and that the demand for the payment of money by the Railway towards the cost of this project is without warrant in law and should be permanently enjoined.

"It is, therefore, ordered, adjudged and decreed that Chapter 132 of the 1921 Public Acts of Tennessee, as amended, be and it hereby is declared null and void, as being in violation of the Constitution of the State of Tennessee and of the United States, in so far as applicable to such a state of facts as set out in the bill of complaint as amended and as disclosed by the evidence."

The State appealed and insists that the chancellor erred in declaring the act void and in holding it unenforceable under the facts. The courts cannot attempt to control legislative policy, nor can they inquire into the expediency, propriety, or even the justice of a statute which violates no provision of the Constitution. *Henley* v. *State,* 98 Tenn., 665, 41 S. W., 352, 1104, 39 L. R. A., 126; *State* v. *Lindsay,* 103 Tenn., 631, 53 S. W., 950; *Walters* v. *State,* 2 Shan. Cas., 69; *Ballentine* v. *Mayor, etc., of Town of Pulaski,* 15 Lea (83 Tenn.), 649, 650; *Townsend* v. *State,* 147 Ind., 624, 47 N. E., 19, 37 L. R. A., 299, 62 Am. St. Rep., 477.

In some instances municipal ordinances have been held unenforceable, maybe void, upon a showing that changed conditions render them unreasonable or inapplicable under particular circumstances or a given situation, but we find no authority for extending that rule to statutes. No violation of any provision of the Constitution is apparent upon the face of the statute,

chapter 132, Public Acts 1921, and none has been suggested by the briefs and argument. It must be conceded that the State, in the exercise of the police power, may directly or through its municipalities compel railroads to share the cost of eliminating grade crossings at railroad tracks, *City of Memphis* v. *Southern Railway Co.*, 167 Tenn., 181, 67 S. W. (2d), 552; *Nashville, C. & St. L. Railway* v. *Drainage District*, 149 Tenn., 490, 261 S. W., 975; *Harriman* v. *Southern Railway Co.*, 111 Tenn., 538, 82 S. W., 213; and also that the State may relocate a highway or build a new highway, and, when necessary for the public safety, may, by the exercise of the police power, require a railroad whose track is encountered by the new location to share the reasonable cost of eliminating a dangerous grade crossing, *Chicago & N. W. R. Co.* v. *Illinois Commerce Commission*, 326 Ill., 625, 158 N. E., 376, 55 A. L. R., 654, and annotations; *Chicago, B. & Q. R. Co.* v. *State*, 47 Neb., 549, 66 N. W., 624, 41 L. R. A., 481, 53 Am. St. Rep., 557.

The question of whether the provisions of the act in question have been rendered burdensome or unreasonable by changed economic and transportation conditions, or whether under existing circumstances have become unfair or inequitable, involves matter of legislative policy, dependent on the result of audits and accountings to ascertain the comparative burdens of taxation upon railroads and other modes of transportation and their comparative expenditures and earning capacity. Courts cannot go into and consider such questions any more than they could consider changed mental attitudes to determine the constitutionality or enforceability of a statute.

The location of Highway No. 20, which is a link in

the highway extending from Nashville to Jackson and Memphis, and the requirement of the state highway department that the railway share the cost of eliminating grade crossing at Lexington, were acts of the State government. The Federal aid contributed toward the establishment of a State highway system, it appears from the record, would not exceed ten per cent of the total expenditures by the State. Its contributions were received and applied by the highway department as provided by chapter 149, Public Acts 1919. The allotment of Federal aid toward the construction of the nine and five-tenths miles of the section of highway from Lexington to Parsons was $100,826.59, or half of the estimated cost of that portion of the road, was accepted by the highway department under that Act. The contribution was made on condition that the highway department conform to prescribed Federal engineering and construction standards.

Admitting the insistence of complainant that the primary object of highway construction and the object of Federal contribution to highways is to invite and stimulate interstate traffic or travel upon the highways, it does not follow that the state roads are not primarily designed to serve the people of the State. Assuming that the Federal Bureau of Public Roads, through its power to grant or withhold Federal aid to state roads, dictated engineering details on Highway No. 20, it was nevertheless a state highway connecting the county seats of Lewis, Perry, and Henderson counties with other state roads in conformity with the provisions of section 8, chapter 100, Public Acts 1915, and sections 7, 8, and 9, of chapter 149, Public Acts 1919.

R. H. Baker, state commissioner of highways, testified

that the object of the department of highways and the object of the Federal government was to build state roads in such way as to make them connect with main highways of other states. But that would not make the construction of a state highway an act of the Federal government. We quote from Mr. Baker's testimony as it relates to Highway No. 20, the location of the underpass at Lexington, and the requirement that the railway share the cost of eliminating the grade crossing.

"Q. Who determined to change the existing route No. 20 through Lexington from the Clifton Street crossing to where it now is to the proposed underpass under the Railway's tracks, and why was this done?

"A. Under section 7, chapter 149 of the Public Acts of 1919, the State Highway Commissioner was given power to proceed to designate the main travelled roads with a view of connecting all county seats and also to designate other main travelled roads which are deemed of sufficient importance to be included in the general highway plan of the State and to receive for their construction and improvement financial aid under the provisions of this act. Under section 9 of this act it is provided that whenever the State Highway Commission feels it necessary or advisable, it shall have power to alter the course or grade or otherwise improve any road selected, adopted or accepted for Federal or State aid and take over and improve as a state highway. The original road was a narrow county road and it was necessary, in order to secure proper alignment and grade, to re-locate this road, which was done in accordance with the authority vested by the above-mentioned section.

"Q. Why, in routing this route No. 20 from the Ten-

nessee River to and through Lexington, did the new road not pass through the Town of Perryville and several other towns and municipalities between the River and Lexington now served by the local county road?

"A. The location of Route No. 20 west of the Tennessee River, insofar as its connection with Perryville is concerned, was determined by the bridge site of the Perryville bridge across Tennessee River. The site at which this bridge was built was far superior to any other in closer proximity to Perryville. The road is located so as to serve adequately various communities which have been built up along the old road, in some instances requiring a short connection between the new location and the old road. . . .

"Q. What was the object of the highway department, if you know, if it was determined while you were in charge, in building this new route from Nashville to Lexington via Centreville and Linden?

"A. The object of the highway department, in constructing roads, has always been to connect county seats and furnish adequate traffic service to local and through traffic, and at the same time open up country which has not heretofore been served with adequate roads or by adequate roads.

"Q. This particular road touches no county seat between Nashville and Centreville, does it?

"A. It does not, no.

"Q. Why is the state highway department undertaking to build this road and this underpass as part of Route No. 20 within the municipal limits of the town of Lexington rather than leave the determination of the route and character of the construction and so on to the municipal authorities?

"A. Under the provisions of chapter 42 of the Public Acts of 1929 the state highway department is given authority, should it so elect, to build a highway through any incorporated town or city in the State of Tennessee. This act also makes it mandatory on the department to pay its proportionate cost, based on eighteen foot width, of any street which is built through any town or city over which state highways are routed. It was under this act and in order to provide a satisfactory length, conforming to the requirements of the department and of the Bureau of Public Rroads, that the section of this route through the town of Lexington was included in our plan. . . .

"A. Prior to the construction of it the travel has been, on account of the unsatisfactory condition of these roads, held practically to a minimum of local traffic.

"Q. In other words, from Perryville to Lexington this county road was an ordinary country road used as any country road of that general type?

"A. I will say it was a very ordinary country road.

"Q. Why, in forming the line for this new route No. 20 from the Tennessee River to Lexington did you not follow the existing county road?

"A. It was impractical to do so on account of its winding location. In building new roads to such standards as roads are built at this time, following old existing grade, adequate service cannot be rendered to any quantity of traffic by doing so, and the money spent in perpetuating a road on improper alignment is money wasted. . . .

"Q. Can you estimate the prospective traffic density through this new underpass at Lexington and what char-

acter of traffic that will be, giving the basis of your estimates?

"A. At the present time the traffic which is using that Route No. 20, both local and through traffic, including the traffic in the town of Lexington, must cross the grade crossing on Clifton Street. When you take into consideration the present condition of Routes 20 and 100 and the betterment which is planned for those routes, it will result in an increase in traffic both as to density and speed. The crossing with the number of train movements which occupy the crossing will become an increased hazard. It was with a view of relieving delays, as well as removing the hazard to the traffic, that we included the grade separation in our plan for the completion of Route 20. . . .

"Q. What is the object and purpose of the State of Tennessee in cooperation with the Federal Bureau of Public Roads under the Department of Agriculture, and what are the plans, in general, which you undertake with the Bureau to work out, and what is it, in general you seek to accomplish?

"A. Well, the object of the Department of Highways and the Bureau of Public Roads in contributing to and building highways is to render traffic service to the people of the State. That covers, I think, or answers the question you asked. . . .

"Q. With reference to this underpass, known as the Lexington underpass, please state why you as Commissioner of Highways, considered it necessary to separate this crossing at grade and what prompted you to direct the N. C. & St. L. Railway to participate in the cost of this separation.

"A. The section of road on which the Lexington un-

derpass is located was in the original highway plan of the State for trunk line highways, and the construction of this section has been deemed necessary in order to render the people of the State proper traffic service. The laws of the State require the participation of railroads in grade separation structures on the State Highway system. The necessity for the development of this route in order to provide proper traffic service and the law requiring railroad participation in this grade elimination prompted me to direct that the N. C. & St. L. R. R. should participate in the cost of the grade separation. The original road which was used for a good many years by local traffic was entirely unsatisfactory in its alignment and grade, and the best information that I have available at the office indicates that there were eight grade crossings on this old road between Perryville and Lexington, including the Clifton Street crossing in Lexington. By the re-location of this as a high standard road, seven of these crossings were eliminated without cost to the railroad company. The eighth which was impossible to eliminate by re-location is eliminated by the construction of the underpass.

"Q. Does that then leave any grade crossings between Perryville to Lexington on the N. C. & St. L. Line?

"A. It does not—on Route 20.

"Q. Do you recall what that distance is between Perryville and Lexington?

"A. From the Tennessee River to the court house in Lexington by the old route is 24.53 miles. From the Tennessee River to the court house at Lexington by the new route is 21.12 miles.

"Q. Did you, as an engineer, basing your answer on your experience as Highway Commissioner, figure that

as a matter of safety not only to the public traveling along the highway, but to the train crews and passenger crews, it was necessary to eliminate this crossing at grade?

"A. I did—yes sir. . . .

"Q. You filed as your Exhibit No. 4 to a question propounded to you in your examination in chief a contract on this project for construction of the road between Lexington and Linden made with the Department of Agriculture of the Federal Government under which the Federal Government participates in the cost of this construction. Please state whether or not it is required in that contract that this grade crossing at Lexington be eliminated.

"A. It is required, and I might read the clause in the contract which is termed a Project Agreement for Project No. E-227A, referring to the elimination of the grade crossing. This clause is found on page 5 under Section D of the Project Agreement, which I quote:

" 'The Highway Department hereby agrees that prior to the final payment of Federal aid on this project it will begin the construction of an underpass between Survey Station 15 plus 00 and 36 plus 04 now made an exception to this project. Such construction to be in accordance with the statutes for Federal aid projects.'

"This particular grade separation is the one involved in this lawsuit.

"Q. Is that the usual practice of the Federal Government in regard to crossings of this character on highways in which the Government participates in the cost?

"A. It is.

"Q. Outside of that requirement by the Government, I believe you stated your judgment as an engineer and

as Highway Commissioner prompted you to require the grade separation anyway?

"A. Yes, sir, I did. . . .

"Q. Why is it, if you know, that the Government requires grade crossing separation on these highways?

"A. Primarily for the safety of traffic using the highways. It is in the discussion of grade elimination the Government has repeatedly brought out the benefits to the railroad companies by reason of the elimination of grade crossing accidents and serious results to the railroad companies from these accidents. . . .

"Q. When Highway No. 100 connecting with Highway No. 20 between Nashville and Memphis, is finished, what will be the effect in regard to relieving Highway No. 1 of some of the traffic that theretofore had been carried on it?

"A. The standard for the location and construction of Highway No. 100 and 20 from Nashville to Jackson— that is, from one end of the route to the other,—is higher than the standard on which Highway No. 1 was built, and for that reason—the fact that the trip can be made faster and more comfortably and safer, this new route to Jackson will relieve Highway No. 1 of a great deal of the traffic it has heretofore carried. It will also relieve State Highway No. 15 of a considerable amount of traffic that it has heretofore carried from east to west and west to east.

"Q. Some contention has been made in the record by some of the witnesses for the railroad company to the effect that the construction of Highways Nos. 100 and 20 were not justified by the conditions that exist along the lines of these routes. Please comment in any way you see fit on this insistence.

"A. Our construction of these routes naturally proves that we disagree with the railroad companies in that contention. The development of the State highway system has been a relatively slow·process, but it has gone about with definite ideas of service to the people in mind and definite plans of ultimate construction. The routes involved in this case serve a wide territory otherwise unserved except by practically impassable county roads, and the population which is located within the territory served we feel is entitled, to proper highway service, and all these things are taken into account in the construction of this route."

The real connection between the purpose of chapter 100, Public Acts 1915, and chapter 149, Public Acts 1919, and chapter 132, Public Acts 1921, and the location and construction of Highway No. 20, and the underpass at Lexington is made clear by the testimony of Commissioner Baker and other evidence in the record. The obvious purpose of the Acts of 1915 and 1919 was to provide a state system of highways, and of the Acts of 1921 to promote the safety of persons traveling the highways at grade crossings as well as to promote the safety of persons traveling the railroads at such crossings by eliminating dangerous grade crossings. That object falls clearly within the police power of the State, and the power was properly exercised when the order was made upon the railroad to aid the State in eliminating the grade crossing at Lexington.

Since chapter 132, Public Acts 1921, is not unconstitutional, and since under the circumstances shown by the record it was properly applied to eliminate the crossing at Lexington, the decree of the chancellor must be reversed, and the bill dismissed.