CITY OF HOUSTON ET AL. v. WILLIAM McCRAW, ATTORNEY GENERAL.

No. 7382.   Decided March 9, 1938.
(113 S. W., 2d Series, 1215.)

128

*R. R. Lewis, C. A. Leddy, Walter E. Boyd, W. M. Holland, Geo. D. Neal* and *Fulbright, Crooker & Freeman,* all of Houston, for relator.

Since it is shown that the tax levy of the City of Houston for the year 1938 is sufficient to defray the cost of operation of said city, and to care for its bonded indebtedness, including the bonds in question, the said bonds are valid and the Attorney General is not justified in declining to approve the issuance of same on the ground that the operating expenses are a first charge upon the entire income of the city, and that such additional miscellaneous revenues can not be taken into consideration for the purpose of determining the bonded debt limit for the city, in view of the fact that a majority of such additional miscellaneous revenues are capable of being destroyed by subsequent acts of the Legislature. City of Cleburne v. Gutta Percha & Rubber Mfg. Co., 127 S. W. 1072; City of Laredo v. Frishmuth, 196 S. W. 190; Corpus Christi v. Woessner, 58 Texas 462.

*William McCraw,* Attorney General, *Effie Wilson-Waldron, Charles B. Walker* and *Joe J. Alsup,* Assistants Attorney General, all of Austin, for respondent.

In a case where an order for election and notice of the election provide that bonds shall mature not to exceed thirty years from their date the city council is unauthorized, by issuing the bonds in installments, to make any bond mature more than thirty years from the date of the first installment. Quisenberry v. Mitchell, (Com. App.) 292 S. W. 160; Black v. Strength, 112 Texas 188, 246 S. W. 79; David v. Timon, 183 S. W. 88; Simpson v. City of Nacogdoches, 152 S. W. 858; Rockwall County v. Roberts County, 103 Texas 406, 128 S. W. 369.

*Lester Settegast,* of Houston, filed brief as amicus curiae.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This is an original mandamus proceeding brought in this Court by the City of Houston and certain of its governing officers against the Honorable William McCraw, Attorney General of Texas, to compel his approval of certain proposed bonds of the City. As pertinent to the decision of this case, we recite the following facts:

### CITY HALL BONDS.

On March 10, 1927, the City Council of the City of Houston duly and legally passed an ordinance submitting to the duly qualified property taxpaying voters of the City of Houston the question as to whether or not the City should be authorized to issue bonds in the sum of $1,000,000.00, such bonds to be payable in not exceeding thirty years *after date of issuance,* in installments, bearing interest from date at a rate not to exceed 5 per cent. per annum, payable semiannually, and to levy a tax sufficient to pay the interest on said bonds and the several installments of principal thereof as each shall respectively mature; and the proceeds of the sale to be used for the purposes of making certain permanent city improvements, to-wit: "Construction of a City Hall and the furnishing and equipment thereof, in and for the City of Houston."

The above ordinance fixed a day for holding the election thereby ordered, prescribed the form of ballot, and, generally speaking, contained all matters proper and necessary for the ordering and holding of the election thereby provided for.

The election above mentioned was duly and legally held on April 11, 1927, and resulted in a majority vote for the issuance of the bonds for the construction of the City Hall and the furnishing and equipment thereof, in and for the City of Houston. The returns of such election were duly canvassed, and the result declared to be in favor of the issuance of such bonds, etc.

On or about June 7, 1928, the City of Houston issued $100,-000.00 of the above bonds for the purposes for which they were voted. These bonds were dated July 1, 1928, and were approved by the Attorney General, registered by the Comptroller, and sold. It appears that $11,500.00 of the proceeds of this issue of $100,000.00 of bonds was paid to architects as a compromise, and the further prosecution of the building of the city hall for the time being dropped. Some other expenses must have been paid out of this money, for finally the sum of $82,500.00 thereof was transferred to the sinking fund for such bonds. So far as we are able to ascertain from the record before us, the City never, by any official act or ordinance, permanently abandoned, or attempted to abandon, the building of the city hall. It simply, for the time being, dropped the project.

On August 17, 1933, the City of Houston, by resolution submitted to the qualified property taxpaying voters the proposition as to whether or not it should, at that time, let the contract to build the City Hall, payment thereof to be made with the proceeds of the above bonds. This election was held on the date fixed, August 26, 1933, and resulted in a substantial majority in favor of proceeding with the project.

1 In November, 1934, the City held an election, at which all qualified voters were allowed to vote, for the purpose of ascertaining the will of such voters as to whether the City should use the bonds voted in 1927 to erect a city hall. In this election a majority of the voters voted against the issuance of such bonds. Another election was held in August, 1935, of the same character as the November, 1934, election, and this election resulted in a majority in favor of the issuance of these bonds and the building of the city hall. We shall not again refer to these last two elections. They were participated in by all qualified voters, and not by qualified property taxpaying voters. In other words, they were mere "straw votes." and, in law, amounted to nothing.

It seems that nothing was done by the City with reference to the issuance of the remaining $900,000.00 of city hall bonds voted in 1927, until 1938. On January 5, 1938, the City determined, by ordinance, to issue the remaining $900,000.00 of these bonds for the purposes for which they were originally voted, to-wit: "Construction of a City Hall and the furnishing and equipment thereof." These proposed bonds are dated January 15, 1938, and mature $30,000.00 on January 15, 1939, and $30,000.00 on the 15th day of January of each succeeding year thereafter, up to and including January 15, 1968. In

other words, these bonds are payable in not exceeding thirty years after *date of issuance* in annual installments. Also, these bonds in all respects conform to the ordinance of 1927, by which the proposition to issue them was submitted to the qualified property taxpaying voters of the City.

### ORPHANAGE AND OTHER ELEEMOSYNARY BONDS.

In August, 1935, the qualified property taxpaying voters of the City of Houston voted to issue $30,000.00 of bonds, payable serially in not exceeding thirty years from their date, the proceeds to be used for "Establishing, equipping and maintaining orphanages and other eleemosynary institutions in and for the City of Houston." These bonds have been duly issued by the City, and, together with the transcript pertaining thereto, submitted to the Attorney General for his approval. It is not necessary to detail further the proceedings with reference to these bonds. They are admitted to be legal, unless they are held illegal for some reason hereinafter mentioned.

### BONDS FOR VARIOUS PERMANENT CITY IMPROVEMENTS.

In April, 1937, the duly qualified property taxpaying voters of the City of Houston, at an election duly and legally held for that purpose, voted to authorize the issuance of $4,100,000.00 of bonds, payable serially in not exceeding thirty years after the date of their issuance, the proceeds to be used for various and numerous lawful purposes set out in the bond election order. We will not attempt to name all of these purposes, as it is not necessary to do so to decide the questions of law presented here. It appears that $1,850,000.00 of these bonds have been duly issued, approved, and registered. We are not concerned with such issue, except indirectly.

On January 5, 1938, the city council of the City of Houston, acting under authority of the election last above mentioned, passed an ordinance issuing $2,150,000.00 more of the bonds authorized by the election of April, 1937, supra. These bonds have been issued, and, together with the transcript pertaining thereto, presented to the Attorney General for approval. We shall not detail these bonds further. It is sufficient to say that we assume they are in all things legal, unless they are held to be illegal for some of the reasons which we shall later discuss.

### EXPOSITION AND CONVENTION HALL BONDS.

Acting under and by virtue of Section 1, Article IV, of its charter, which confers on the city council the power and authority, by ordinance duly passed, to borrow money on the credit of the City, for permanent improvements in an amount

not to exceed $100,000.00 in any one year, and to issue bonds of the City therefor without holding an election, the City in January, 1938, duly and legally issued $100,000.00 of bonds for the purpose of "Construction of an Annex to the Exposition and Convention Hall, in and for the City of Houston." These bonds will not be described further. It is sufficient to say that they are legal, and should be approved unless they are found illegal for some reason hereinafter mentioned in this opinion.

It appears from the record before us that all the several issues of bonds here involved, and the respective transcripts and the proceedings pertaining thereto, have been duly submitted to the Attorney General for his inspection and approval, as required by Article 709, R. C. S. of Texas, 1925, and that after making such investigation, he has refused such approval.

OPINION.

We shall first deal with the objection of the Attorney General which applies to all the bonds involved in this mandamus proceeding.

ALL BONDS.

It appears from the record before us that the City of Houston is a home rule city, and that it operates under a charter granted it by the Texas Legislature. This charter contains a provision which limits the ad valorem taxing power of the City for all purposes, including general operating expenses and paying interest, and providing sinking funds on all indebtednesses, bonded and otherwise, to not exceeding $2.00 on the $100.00 appraised valuation of all taxable property. No division between bonds and operating expenses is attempted to be made in the charter. It also appears from the record before us that it now requires a total ad valorem tax levy of $1.14 on the $100.00 valuation of all taxable property within the City to service its indebtedness, including the bonds here involved, and all bond issues heretofore voted and issued, and now outstanding. Such tax rate of $1.14 has been levied. This leaves an ad valorem taxing power of $0.86, which may be levied and the proceeds devoted to general operating expenses. It is admitted that this $0.86 alone is not now, and will not in the future, be sufficient to pay the ordinary and necessary operating expenses of the City. It is further admitted that the City now has other sources of revenue, such as occupation taxes, franchise taxes, rentals, parking meters, and various other sources of revenue which, together with the $0.86 ad valorem taxing power, are producing sufficient revenue to operate the

City. The City has levied the $0.86 for general operating expenses. In additional to such ad valorem taxes, the City is utilizing the other sources of revenue above named, and the revenues derived therefrom are being used to aid in paying its various operating expenses. Finally, it appears that there are other sources of revenue open to the City which it has never utilized, but which can be utilized should the necessity therefor arise. It will be assumed, for the purposes of this opinion, but not decided, that the Legislature has the power to withdraw most, if not all, of the sources of income to the City except the ad valorem taxing power.

If we properly interpret his brief, the Attorney General contends that each and every bond issue here involved is illegal and should not be approved, because the ad valorem taxing power of the City alone is insufficient to pay its current operating expenses, and at the same time service these bonds, and the bonded indebtedness of the City already outstanding. In other words, the Attorney General contents that, under the Constitution and laws of this State and the charter of this City, the City's debt creating limit has been reached when the highest ad valorem tax rate available to it, excluding all other sources of revenue, is alone not sufficient to pay general operating expenses and service its outstanding indebtedness, bonded and otherwise. As shown by the statement we have made, if this is the law, these bonds should not have been issued, and should not now be approved.

2-4 As already shown the maximum ad valorem taxing limit of the City is $2.00. All bonded indebtednesses must be serviced out of ad valorem taxes, and such taxes must be levied to that extent. The charter of this City does not set aside any particular part of the ad valorem taxes authorized to be levied for bond purposes alone, and neither does it set aside any particular part thereof for other purposes. It must follow that the law requires that a sufficient part of the ad valorem taxes must first be allocated to servicing outstanding bonds or other indebtednesses. Any balance may be levied and used for general operating expenses. Of course, when a city becomes insolvent in the sense that it does not have sufficient revenues to continue to operate, and at the same time pay its indebtednesses, the operating expenses become a first charge on its ad valorem tax revenues, unless such taxes are by express law authorized to be levied for indebtedness or other purposes only.

5 As previously shown, a tax of $1.14 will service these bonds and all other outstanding indebtednesses of the City. This leaves

a tax of $0.86 which may be, and which has been, levied for general operating expenses. This tax, together with other sources of revenue available, and now being utilized, furnishes the City with sufficient funds to pay its operating expenses. When we come to examine the Constitution and laws of this State and the charter of this City, we find that no direct provision is contained therein providing for the rule as contended for by the Attorney General. This charter simply limits ad valorem taxes to a $2.00 rate for all purposes. The laws of this State and the charter of this City furnish the City various sources of revenue in addition to ad valorem taxes. To our minds, these additional sources of revenue are as certain and as stable, for all practicable purposes, as ad valorem taxes. It it true that franchise taxes, parking meter revenues, occupation taxes, fines, and things of that kind may fluctuate, and that such revenues are in a sense uncertain; but so are all human institutions and all sources of revenue, public and private. Even ad valorem revenues are, to a certain extent, uncertain, because values are subject to shrinkage, and in times of stress taxpayers fail to pay. In spite of this, it can not be said that such a danger would justify us in holding a bond issue illegal.

The Attorney General cites the cases of City of Corpus Christi v. Woessner, 58 Texas 462; City of Belton v. Harris Trust & Saving Bank, (Civ. App.) 273 S. W. 914; Hidalgo County v. Haney, (Civ. App.) 67 S. W. (2d) 409; City of Tyler v. L. L. Jester & Co., 97 Texas 344, 78 S. W. 1058, as supporting his contention as above stated. We shall not attempt a discussion of all of these cases. It is sufficient to say that in our opinion none of them support a ruling different from the one we have made. The City of Belton opinion is nearest in point. It holds that the limitation fixed by the City on the City's taxing power "necessarily limits the amount of debt which can be created to such a sum, that the interest and sinking fund upon which, in addition to current expenses of the City, can be discharged by a tax of not exceeding 2½ per cent." A rate of 2½ per cent. was the limit of taxation in that case. We do not interpret such language to mean that a city can not issue bonds unless its highest ad valorem tax rate alone will pay its debts and all operating expenses; but merely to mean that a city's debt creating power has been reached when its total income is insufficient to pay operating expenses, interest, and sinking fund charges.

6  Finally, in regard to the above matter, we wish to say that we do not want to be understood as holding that the Attorney

General has no power under Article 709 et seq., R. C. S. 1925, to inquire into the facts relative to a proposed bond issue to ascertain whether sufficient ad valorem taxing margin is in existence, and may reasonably be expected to remain in existence, to pay the same. To the contrary, we think such power does exist and that it is the duty of the Attorney General to exercise it. In this case we simply hold that where a city has sources of revenue which are reasonably stable and sure, other than ad valorem taxes, the Attorney General should consider such other sources in passing on the question as to whether or not there is, and will be, sufficient margin of ad valorem taxing power to pay the bonds presented for approval. In the case at bar we interpret the answer of the Attorney General to say that his refusal to approve these bonds is based alone on his interpretation of the law, which would preclude his consideration of sources of revenue other than ad valorem taxes. We hold that such interpretation of the law is erroneous.

What we have said above disposes of the objection that the Attorney General has made common to all the bonds here involved. What we shall hereinafter say refers only to city hall bonds.

### CITY HALL BONDS.

As already shown, the city hall bonds here involved were voted in 1927. The order of election regarding the authority to issue same expressly provided that they shall *"be payable, in not exceeding thirty (30) years from the date of their issuance in annual installments."* The first issue of $100,000.00 of these bonds was dated July 1, 1928, and such issue is made payable serially thereafter from one to thirty years. The $900,000.00 issue here involved is dated January 15, 1938, and matures serially from one to thirty years from such date. The last maturity date of these bonds will be January 15, 1968, while the last maturity date of the $100,000.00 issue will be July 1, 1958. It will thus be seen that a large part of these bonds will mature nearly ten years after the last bonds of the $100,000.00 issue.

7, 8 If we properly interpret his brief, the Attorney General contends that this issue of city hall bonds is illegal and should not be approved, because they are so issued that some of them will mature more than thirty years from the date of the $100,-000.00 issue. In this regard, if we properly interpret his brief, the Attorney General contends that, under the laws of this State and the charter of this City, in a case where the order

for an election and notice of election provides that bonds shall mature not to exceed thirty years from their date, and the City issues in one issue a part of the bonds so authorized, no other bonds involved in the same election and notice can thereafter be issued which mature more than thirty years from the date of the first bonds. We are unable to sustain this contention. No constitutional, statutory, or charter provision so expressly provides. The election order and notice simply provide for authority to issue $1,000,000.00 in city hall bonds, payable in not exceeding thirty years after *date of issuance,* in annual installments. It is the settled law of this State that, where an election results in a majority in favor of the issuance of bonds to a certain total amount for a specific purpose, it is not necessary that all the bonds so authorized be issued at one time, or in any one installment. City of Austin v. Valle, (Civ. App., writ refused) 71 S. W. 414; Cohen v. City of Houston, (Civ. App., writ refused) 176 S. W. 809. In this regard, where bonds are authorized in a certain sum for a specific purpose, the City can issue at one time in one issue, or it can issue at different times and in different issues. Of course, the whole must not exceed the original amount authorized. We think this very rule ought to lead to the conclusion that the phrase *"date of issuance,"* as used in this order, means that each issue of bonds shall be payable thirty years from the date of its particular issue. State ex rel. School Dist. of Kansas City v. Thompson, 327 Mo. 144, 36 S. W. (2d) 109.

**9** The Attorney General contends that these bonds should not be approved, because an unreasonable length of time has elapsed since the authority to issue them was granted by the qualified property taxpaying voters of the City at an election held for that purpose. If we properly interpret his brief and argument, the Attorney General contends that, where authority to issue bonds is conferred at an election lawfully held for the purpose, such authority is lost, or becomes inoperative, if it is not exercised by the governing body within a reasonable time after such election. It seems to be held in the case of City of Austin v. Valle, supra, Cohen v. City of Houston, supra, and Fleming-Stitzer Road Building Co. v. Chastain, (Civ. App.) 241 S. W. 619, that, where authority to issue bonds has been conferred on a governing body by an election ordered and held for that purpose, such governing body may exercise such authority and issue such bonds within a reasonable time after such election. On the other hand, these same authorities, in effect, hold that the question as to what is a reasonable or unreasonable length of time cannot always be determined by the length of time alone,

but that all of the surrounding facts and circumstances must be taken into consideration. In the case at bar the original election to issue these bonds was held in 1927. About six years later, on August 26, 1933, at an election ordered and held in the City on the question, the qualified property taxpaying voters thereof again expressed it as their desire that these bonds should be issued, and the city hall constructed, etc. The ordinance providing for the issuance of these bonds was passed on January 5, 1938, a little more than four years after the election of August 26, 1933. It thus appears that not ten years, but only a little more than four years have elapsed since the last expression of the qualified property taxpaying voters on the question. We do not understand that the Attorney General even contends that an unreasonable length of time has elapsed since the election of August 26, 1933. Furthermore, we hold, as a matter of law, that the lapse of a little more than four years under the facts and circumstances of this case is not unreasonable. In this connection, we call attention to the fact that during a part of this time the Country and City were in great financial stress. Further, it is shown that during most of this time the City has been negotiating with the Federal Government for a Federal grant to aid it in building a city hall. This Federal grant has now been granted in the sum of $818,000.00. We think that, when the City had a reasonable hope of securing so large a grant, it was justified in waiting for that event.

10 Finally, we think that when the governing body of any municipality is authorized by vote of the duly qualified taxpaying voters to issue bonds for lawful public purposes the matter of when or how soon such power should be exercised is primarily for the decision of such governing body, and its action or decision in the premises should be considered final unless it acts arbitrarily or fraudulently. No facts are pleaded here which would constitute fraud or arbitrary action even as applied to the ten year period.

The Attorney General contends that the facts of this case show that the City has abandoned the project to issue these bonds and build a city hall. We think this issue is bound up in the issue of unreasonable delay. It has, therefore, been disposed of in our discussion of that issue.

The mandamus prayed for by relator is granted.

Opinion delivered March 9, 1938.