[No. 28567. Department One. April 17, 1942.]

THE BREMERTON MUNICIPAL LEAGUE *et al., Respondents,*
v. THE CITY OF BREMERTON, *Respondent,*
HECTOR MCKENZIE *et al., Appellants.*[1]

[1]Reported in 124 P. (2d) 798.

*Helen Graham, Houghton, Cluck & Coughlin,* and *E. K. Murray,* for appellants.

*J. W. Bryan, Sr.,* for respondents Bremerton Municipal League *et al.*

*J. W. Bryan, Jr.,* for respondent city of Bremerton.

MILLARD, J.—The Bremerton Municipal League, a corporation, of which J. W. Bryan is president, and J. W. Bryan, as a taxpayer, instituted this action against the city of Bremerton for the purpose of obtaining a declaratory judgment validating ordinance No. 893 of the city of Bremerton, enacted June 11, 1929. That ordinance authorized the issuance of bonds not to exceed seven hundred and fifty thousand dollars, for the purpose of acquiring the then existing electric light and power plant and system serving the city of

Bremerton or, in the alternative, of constructing an electric light and power plant which would be a substantial duplicate of the plant then serving the city.

Hector McKenzie, a resident and taxpayer of Bremerton, and public utility district No. 1 of Kitsap county were granted leave to intervene. The position of defendant city was in harmony with the position of plaintiffs that the ordinance was valid. The interveners challenged the validity of the ordinance on three grounds, of which we notice only one, as it is determinative of the question of the validity of the ordinance. Trial of the cause to the court resulted in entry of a judgment that the ordinance is valid. The interveners appealed from that judgment.

Briefly, the facts are as follows: The city of Bremerton has received electrical service from the Puget Sound Power & Light Company or its predecessors since 1902, under a franchise granted in that year and an extension made in 1931 of that franchise. The following provision is contained in the franchise:

"The said Company covenants and agrees that if the said Town of Bremerton so elects, it binds itself to sell the entire plant, equipment, rights, leases, real estate or other assets, at a price to be fixed by competent board of appraisers to the said Town of Bremerton. . . . This option of purchase, however, to be exercised only at the end of any five year period after the completion of the plant."

The electors of the city of Bremerton adopted ordinance No. 893, June 11, 1929. Under date of July 2, 1929, the city notified the power company that it was ready to enter into negotiations for the purchase of the existing plant as then owned and operated by the power company. No further steps were taken toward the acquisition of the power company's properties until 1941, when a new notice was given by the city to the power company of the city's intention to exercise

the option to purchase the power company's properties. An action was immediately commenced for specific performance of the option (City of Bremerton v. Puget Sound Power & Light Company), which suit was removed to, and is now pending in, the Federal court.

During the latter part of 1929, or early in 1930, the city treasurer showed a copy of ordinance No. 893 to various Seattle investment houses in an attempt to obtain quotations on bonds which might be issued to purchase the power plant. No further information was given to the investment houses. The quotations of only about fifty cents on the dollar received by the city treasurer were attributed to the condition of the bond market. This witness testified, however, that water revenue bonds of the city were sold during the same period. It appears that no additional effort to sell bonds, which might be issued under the ordinance, was ever made. In 1931, the electors of the city of Bremerton voted a renewal of the franchise of the power company for ten years. In 1932, the city commission entered into a contract for the purchase of electric energy from the power company. In 1935, the city employed a consulting engineer to make a study respecting the feasibility of acquisition by the city of all electrical properties operated by the power company in Kitsap county. This engineer made his report on that investigation in October, 1935, and received for his services two hundred and fifty dollars out of a "light plant appraisal fund" to which money had been appropriated by the city in 1933. In January, 1941, which was more than eleven years after the adoption of ordinance No. 893, the city commenced the action, to which reference is made above, against the power company, which action is now pending in Federal court. Subsequently, this action was instituted to validate the ordinance. Respondent plaintiffs pleaded and re-

spondent defendant answered that after careful consideration it seemed highly probable that the amount of seven hundred and fifty thousand dollars, voted June 11, 1929, would be insufficient to purchase the existing light and power system "and that it will be necessary for the City of Bremerton to at once undertake the construction of a new plant and system in substantial duplication of the existing plant."

From the foregoing, it is clear that the city intends the construction of an electric system, duplicating the electrical properties of the power company now existing and not in duplication of the system as it existed in 1929 when ordinance No. 893 was passed.

Great changes have occurred since 1929 in the city of Bremerton in regard to extension of corporate limits and increase in population and industry. These changes, together with the increased population in areas contiguous to the city, have resulted in proportionately greater increase in the number of users of electric energy, and basic changes by way of replacements, extensions, etc., in the character of the system required to serve those patrons.

Conceding, *arguendo,* that ordinance No. 893 is not void for indefiniteness, counsel for appellants contend that the ordinance was rendered void by reason of lapse of unreasonable time and changed circumstances. The ordinance in the case at bar may be classified as an administrative ordinance which, upon approval by the voters of Bremerton, conferred upon the city commissioners of that city authority to acquire and operate electric properties. The ordinance was adopted for the purpose of authorizing certain acts which were to be performed at once or within a reasonable time in absence of any provision in the ordinance to the contrary. That is, as counsel for appellants argue, time is a factor of the utmost importance, especially when

the situation with reference to which the extent of the authority originally was defined is constantly changing.

· An apt authority is *Barber Asphalt Paving Co. v. Kansas City Etc. Brick Co.*, 170 Mo. App. 503, 156 S. W. 749. In that case, the plaintiff sought recovery on special tax bills for paving a Kansas City, Missouri, street with asphalt. One of the defenses, which the trial court refused to consider, was that the ordinance which authorized the work was enacted July 30, 1900, while the contract under which the work was performed was not let until May 26, 1902, and that, by reason of the long and unreasonable delay in letting the contract and causing the work to be done, the power to make the contract ceased and the tax bills were therefore null and void. On appeal, the judgment was reversed on two grounds. The appellate court held that the defense should have been considered, since the delay, unexplained, was unreasonable, and if unreasonable would deprive the city of power to proceed under the ordinance. In the course of the opinion, the court said:

"It is held that, *where the original ordinance prescribes the time* in which the work must be done, the authorities must proceed in the usual course of such matters and within the limits thus prescribed, and they cannot abandon an improvement and then after the lapse of a long period of time resume jurisdiction at the place where it was left off. [*Marshall v. Wisdom*, 127 Mo. App. 640.] It is also well settled that proceedings had under an ordinance which specifies no time in which the work is to be done are not invalid merely because no time is specified in the ordinance. But it is further held, that where the original ordinance specifies no time, a reasonable time is implied. [*Ayers v. Schmohl*, 86 Mo. App. 349; *Heman v. Gilliam*, 171 Mo. 258, l. c. 269, 271.] So that, if the ordinance specifies no time, this does not mean that there is no limit upon the time when the work is to begin or

in which it is to be finished. All the authorities hold that the time limits provided in the original ordinance must be observed and the work done within those limits or the tax bills will be void. If, therefore, the original ordinance gives a reasonable time for the work to be done, this reasonable limit must be observed just the same as a specified limit would have to be observed had it been imposed. In the case at bar there was a delay of one year, nine months, and twenty-three days before the letting of the contract under which the work was done. This length of time *unexplained* is not a reasonable time. If the contract can be delayed thus long without explanation, what is to prevent a delay of two years, or three or five? When the work was finally begun it was finished within sixty days, consequently, on the face of things, a delay of nearly two years before the work is even begun is unreasonable and beyond the limit of time implied in the original ordinance. What is a reasonable time usually depends upon the facts in the case and must be determined in the light of all the circumstances. [*Gunby v. Brown*, 86 Mo. 1. c. 258.] But the court struck out the defense, setting up the fact that there was an unreasonable delay. Hence no inquiry could be made into the question whether, under the facts, the delay was reasonable or unreasonable. This was error. If we approve this ruling by affirming this case we thereby say, in effect, that no delay will invalidate the proceeding where the ordinance does not fix a precise time limit. Because, if an unexplained delay of nearly two years is allowable, where is the limit to be fixed? . . . Such defense should have been allowed to be made, so that the reason for the delay could be inquired into. It may be, there was good reason for the delay in letting the contract, that is, the delay was reasonable, in which case the property owner would have no grounds for complaint."

In the case cited, it was held that if the delay in letting the contract was unreasonable there would be an absence of authorization for the contract so that the contractor could not recover for his work after doing

it. In the case at bar, the parties join in the prayer for a declaratory judgment determining the rights of the parties in advance so that if the proceedings contemplated by the ordinance are now unauthorized that fact may be known and loss avoided.

When authorizing the acquisition or construction of properties, as in the case at bar, the electors have in mind the then present situation. It is contemplated by the electors that steps will be taken in accordance with the ordinance, upon which they are voting, within a reasonable time after its passage. If action pursuant to the ordinance is delayed for a long time, and the circumstances contemplated by the electors change materially, the election is deprived, as counsel for appellants argue, of significance. If, after the lapse of an unreasonable time and fundamental changes in circumstances, the ordinance were revived and applied to conditions entirely different from those contemplated at the time of the passage of the ordinance, that would, in effect, constitute fraud upon the electors.

The investigation in 1935 of the consulting engineer to determine the feasibility of proceeding under a plan entirely different from that adopted in ordinance No. 893, is not evidence that the city commission of Bremerton intended in 1935 to proceed under ordinance No. 893. It is clear that there was a delay of more than eleven years from the time of the enactment of ordinance No. 893 before the city of Bremerton made any showing of serious intention to proceed to acquire a power plant under the provisions of ordinance No. 893.

The only reason offered for this delay of more than eleven years was that there was a lack of a bond market. The evidence is that the city treasurer, in company with one other person, interviewed the bond houses in Seattle the latter part of 1929 and the early

part of 1930, respecting quotations, and that no further efforts were made thereafter to sell the bonds. The city treasurer, on the occasions mentioned above when he interviewed the bond houses in Seattle, took with him a copy of ordinance No. 893 without any other information as to purchase price, cost of construction, or aught else, and on that alone requested quotation on bonds which might be issued. The highest tentative bid, the city treasurer testified, was approximately fifty cents on the dollar. In September of 1929, the city's water bonds were sold, and no reason has been suggested why the city's light and power bonds could not have also been sold.

Many changes occurred from 1929 to the present time. The population of the city of Bremerton increased about fifty per cent, and there was a similar increase during this period in population in Kitsap county. Since 1939, the area of the city increased by approximately thirty-five per cent. Building permits issued in 1940 were about one and one-half million dollars, as compared with three hundred and sixty odd thousand dollars in 1929. The number of customers of the power plant increased from three thousand in 1929 to about five thousand at the present time, and this does not include the new Federal housing projects which represent probably two thousand more. One year prior to the trial of this action, a sixty-six thousand volt transmission line was constructed to serve the city.

Construction costs have so increased during recent years, both as to materials and labor, that it is improbable whether a system could be constructed at this time for seven hundred and fifty thousand dollars, which is the maximum amount authorized by ordinance No. 893. The evidence is overwhelming, and the city admits, that it would be impossible to acquire

the existing power company's properties under the provisions of ordinance No. 893. It is likewise clear that the plan of construction now contemplated is wholly different from that authorized by ordinance No. 893, which provides that the city commission shall construct a complete new system substantially according to the general plans of the then existing system.

■ That an ordinance speaks as of the time of its adoption needs no citation of sustaining authority; therefore, ordinance No. 893 referred to the power company's properties as they existed in 1929, and only those properties. The electrical properties which existed in 1929 are entirely different from those now existing in the city of Bremerton. If the city intends to construct properties in substantial duplication of those now existing, its purpose is to fundamentally depart from the terms of the ordinance authorizing the substantial duplication of the properties as they existed in 1929. This of itself constitutes an admission on the part of the city of the inapplicability of the ordinance at the present time.

By the allegations of respondent plaintiffs and answer of respondent defendant, and the evidence adduced on behalf of the respondents, it is established that the city intends to construct properties in substantial duplication of those now existing and not to duplicate those existing in 1929 when ordinance No. 893 was adopted.

■ ■ Ordinance No. 893 has been rendered void through lapse of an unreasonable time and changed circumstances. The statute (Rem. Rev. Stat., § 9489 [P. C. § 1215]) provides that, whenever a proposition, as in the case of ordinance No. 893, has been adopted, the corporate authorities shall have power to proceed forthwith to purchase, construct, and acquire the pub-

lic utility contemplated, or to make additions, better-ments, and extensions thereto, and to make payment therefor as provided in other sections of the statute. The purpose of the statute, which requires submission of a proposition to the electorate, is that the people may have an opportunity to pass upon the proposed acquisition at a time sufficiently close to the date of the acquisition of the property so that the vote may rea-sonably reflect the desires of the people then con-cerned, under conditions then existing. Implicit in the use of the word "forthwith" is the thought that, if the framers of the law did not intend that the corporate authorities proceed *immediately,* the legislators did contemplate that the corporate authorities would act with reasonable promptness.

In addition to *Barber Asphalt Paving Co. v. Kansas City Etc. Brick Co., supra,* in which it was held that un-explained delay for less than two years in proceeding under an ordinance authorizing certain construction might well be considered unreasonable, there are other cases which, in principle, are indistinguishable from that authority.

The authorities of the city of Bayonne, N. J., com-menced proceedings, the purpose of which was to pro-vide for the laying of sidewalks and crosswalks on a street in that city. The proceedings were instituted in March, 1891, and were carried on until October 20, 1891, when the owners of a greater portion of the lands along the line of the street made a written remon-strance to the city council against the improvement. The remonstrance was referred to the city's committee on streets where it rested until June, 1893, when the then existing committee on streets recommended that the improvement be made. After advertising for bids, the city council awarded the work to Matthew Ryan, De-cember 5, 1893. Ryan entered into a contract with the

city December 14, 1893, for the performance of the work. By certiorari instituted December 30, 1893, the supreme court of New Jersey in *State ex rel. Van Anglen v. Mayor, Etc., of Bayonne,* 56 N. J. L. 463, 29 Atl. 168, determined the validity of the contract. The court said:

"Without adverting to other objections urged by the prosecutors, it appears that the commissioners of assessment failed to file their report and map within twenty days after the ordinance was referred to them, an omission which this court, in *Gleason v. Bergen,* 4 *Vroom* 72, and *Central Railroad Co. v. Bayonne,* 6 *Id.* 332, adjudged to be fatal.

"When, therefore, the remonstrance was presented and referred by the council to its committee, this was the situation: the municipal authorities might proceed forthwith to carry out the improvement, subject to being stopped by a *certiorari* granted before the signing of a contract for the work, or they might abandon the enterprise. Which of these two courses was chosen is, I think, made clear by their subsequent conduct. Instead of proceeding forthwith to execute the work, they did nothing, nor was anything attempted until twenty months had elapsed, during which the term of every member of the council had expired, and the entire *personnel* of the committee on streets had changed. Such a delay, following upon so substantial a remonstrance, would surely lead the remonstrants, and leads this court, to a belief that the projected improvement was abandoned. That being so, there were in June, 1893, no proceedings pending in which 'a contract was to be made' within the meaning of the charter, and consequently there were no proceedings the review of which, by *certiorari,* could be barred by the mere making of a contract.

"The writ was not improvidently allowed, and because of the illegality above mentioned the proceedings should be set aside."

In *Nashville, C. & St. L. R. v. Baker,* 167 Tenn. 470, 71 S. W. (2d) 678, the supreme court of Tennessee

recognized the rule that in some instances municipal ordinances may be held unenforcible upon a showing that changed conditions render them unreasonable or inapplicable under particular circumstances; however, the court held that the rule should not be extended to statutes and rejected a defense of that nature. Such defense had been interposed by the railroad company with reference to an order promulgated pursuant to a statute which required the railroad company to pay one-half of the cost of elimination of a grade crossing. On appeal, United States supreme court in *Nashville C. & St. L. R. Co. v. Walters*, 294 U. S. 405, 79 L. Ed. 949, 55 S. Ct. 486, reversed the supreme court of Tennessee and held that the defense should have been considered so as to determine whether it was supported by the evidence. The court said:

"A statute valid as to one set of facts may be invalid as to another. A statute valid when enacted may become invalid by change in the conditions to which it is applied. . . ."

See, also, to the same effect *Chastleton Corp. v. Sinclair*, 264 U. S. 543, 68 L. Ed. 841, 44 S. Ct. 405.

Reason supports the authorities to the effect that an ordinance approved by the electorate authorizing a municipal corporation to issue bonds or perform some other act may, if there is unreasonable delay or if conditions change, becomes inoperative and ceases to vest the municipal authorities with authority for the purpose contemplated by the ordinance. In none of the cases which hold that, under the facts in the case then presented, the delay was not unreasonable, was there delay as great as in the case at bar, and in each a valid cause for the delay was shown. Those cases, however, recognize the rule invoked by counsel for appellants.

In *Dayton v. Board of Education*, 201 Ky. 566, 257 S. W. 1021, the board of education of Dayton, Ken-

tucky, instituted an action to require the mayor and city council to adopt an ordinance providing for the issuance of school improvement bonds in the amount of seventy-five thousand dollars theretofore voted by the people. The authorization for the issuance of the bonds was voted in 1919, but the school board did not make demand upon the city council for preparation and authorization of the bonds until April or May, 1922, or a period of more than three years after the bonds were voted. The court said:

"The circumstances surrounding the election and the conditions prevailing in the building trades as well as in the schools with respect to the building, have been such that since the voting of the bonds the board of education has postponed from time to time, the issual and sale thereof, but we do not think that under the facts of this case the board of education has been guilty of such laches as would preclude it from exercising its right under the authority granted by the vote of the people to issue the bonds. In such matters the board of education has a discretion which may be exercised within reasonable limits. . . .

"We do not think the issual of the bonds has been delayed unreasonably, and the board is now entitled to have the co-operation of the city council in the preparation and issual of the bonds."

See, also, *Young v. Fiscal Court of Trimble County,* 190 Ky. 604, 227 S. W. 1009; *McNichols v. Denver,* 101 Colo. 316, 74 P. (2d) 99.

In *Houston v. McGraw,* 131 Tex. 127, 113 S. W. (2d) 1215, an election held in 1927 authorized a bond issue for a city hall. Six years later (August 26, 1933), a second election on the same question resulted in a second expression of approval of the bond issue by the voters. Almost four years later (January 5, 1938), an ordinance was adopted which provided for issuance of the bonds. The delay of the first four years was explained by the fact that the city had been in great

financial stress and by the further fact that during most of the time the city was negotiating with the Federal government for a grant to aid in building the city hall. The court pointed out, in the course of its opinion, that the delay during almost the entire period was explained by special facts and the delay amounted to four instead of ten years; that, upon the facts, the time which had elapsed was not unreasonable. The court said:

"If we properly interpret his brief and argument, the Attorney General contends that, where authority to issue bonds is conferred at an election lawfully held for the purpose, such authority is lost, or becomes inoperative, if it is not exercised by the governing body within a reasonable time after such election. It seems to be held in the case of *City of Austin v. Valle, supra, Cohen v. City of Houston, supra,* and *Fleming-Stitzer Road Building Co. v. Chastain,* (Civ. App.) 241 S. W. 619, that, where authority to issue bonds has been conferred on a governing body by an election ordered and held for that purpose, such governing body may exercise such authority and issue such bonds within a reasonable time after such election. On the other hand, these same authorities, in effect, hold that the question as to what is a reasonable or unreasonable length of time cannot always be determined by the length of time alone, but that all of the surrounding facts and circumstances must be taken into consideration. In the case at bar the original election to issue these bonds was held in 1927. About six years later, on August 26, 1933, at an election ordered and held in the city on the question, the qualified property taxpaying voters thereof again expressed it as their desire that these bonds should be issued, and the city hall constructed, etc. The ordinance providing for the issuance of these bonds was passed on January 5, 1938, a little more than four years after the election of August 26, 1933. It thus appears that not ten years, but only a *little* more than four years have elapsed since the last expression of the qualified property taxpaying voters on the question. We do not understand

that the Attorney General even contends that an unreasonable length of time has elapsed since the election of August 26, 1933. Furthermore, we hold, as a matter of law, that the lapse of a little more than four years under the facts and circumstances of this case is not unreasonable. In this connection we call attention to the fact that during a part of this time the Country and city were in great financial stress. Further, it is shown that during most of this time the city has been negotiating with the federal government for a federal grant to aid it in building a city hall. This federal grant has now been granted in the sum of $818,000.00. We think that, when the city had a reasonable hope of securing so large a grant, it was justified in waiting for that event."

The foregoing was followed by comment, which is merely dictum, to the effect that, when the governing body of a municipal corporation is authorized by the electorate to issue bonds for lawful public purposes, the matter of when or how soon such power should be exercised is primarily for the decision of such governing body and its decision in the premises should be considered final, unless it acts arbitrarily or fraudulently. That observation is not supported by any authority. So, too, the case cited is distinguishable on the facts from the case at bar. A delay, such as in the case at bar, under the circumstances, is unreasonable and terminated the authority granted to the city of Bremerton by ordinance No. 893.

The judgment is reversed.

ROBINSON, C. J., MAIN, STEINERT, and DRIVER, JJ., concur.